# The State, *ex rel.* Plock & Co. *v.* Cobb.

*Application for Mandamus to Governor, in matter of Renewing Railroad Bonds.*

1. *When mandamus lies to governor.*—Whether the governor, in the performance of duties devolved on him in his official capacity, can be controlled by the judicial department of the government, "is a question not free from difficulty, and embarrassed by a conflict of authority;" and the court expresses no opinion on that question in this case, nor on the correctness of the rule laid down in the case of *Tennessee and Coosa Railroad Company v. Moore*, 36 Ala. 371.

2. *Power of General Assembly in adjustment of State debts.*—The State can not, by any act of its own, any expression of the legislative will, or any agency whatever, lessen, change, impair or destroy the legal obligation of contracts into which it has entered; but, proposing an adjustment of its liabilities, and of claims and demands against it, the General Assembly has undoubted power to declare that only particular liabilities, or special claims and demands, shall be adjusted; its powers in this respect being the same as those of an individual debtor to provide for the adjustment, security, or payment of particular debts, omitting others of equal or greater obligation.

3. *Governor's power as agent of State.*—The governor has no general authority to contract in the name of the State, and thereby to bind it; and whenever the power to enter into particular contracts, binding on the State, is conferred on him by statute, the power is special, as distinguished from the general power which every person has in conferring authority on an agent, and is limited by the statute conferring it.

4. *Same.*—When the exercise of such special statutory power is made to depend on the happening of future events or contingencies, and the ascertainment of the happening of such events or contingencies is committed to the governor; if, in good faith, and with reasonable diligence, he determines that they have occurred, the exercise of the power is valid, and binding on the State, as to all persons dealing honestly in reliance on it, although it may be afterwards discovered that he was mistaken, misled, or deceived.

5. *State indorsement of railroad bonds; authority of governor under statute.* Under the provisions of the act approved November 17, 1868, relating to the Wills Valley Railroad Company and the North-east and South-west Railroad Company, it was made the duty of the governor to indorse, in the name of the State, the bonds of the company owning the franchises of the corporation last named, whenever it should appear to him, "by satisfactory proof," that particular sections of the road had been finished, completed, and equipped; and

[The State, ex rel. Plock & Co. v. Cobb.]

he was required by the act approved February 19, 1867, to make such indorsements on bonds, on the affidavits of the president and chief engineer, and a resolution of the board of directors, showing and promising compliance with the conditions of the act. Under these statutory provisions, if satisfactory proof was made to the governor of the completion and equipment of a speci-fied number of miles of the road, and the affidavits and resolution required by the statute were made and presented to him, it was his duty, not having reason to doubt the truth of the facts as stated and certified, to indorse the bonds of the company to the amount thereby shown to be proper; and such indorsements would be a valid exercise of his statutory power, and would be binding on the State, although it might be made to appear, in a subsequent controversy between individual bondholders, that the affidavits were false, and that he had in fact indorsed more bonds than the company was entitled to receive.

6. *Same.*—The statute itself contains provisions intended to protect the State against indorsements obtained by fraud or mistake, or bonds sold by the company at less than ninety cents on the dollar ; and exact conformity between the amount of bonds indorsed and the actual length of the road, at the rate of $16,000 per mile, is not a "term, condition, or requirement of the statute," on which depended the power and duty of the governor to make the indorsements.

7. *State's power to contract, and liability on contracts.*—Except so far as re-strained by constitutional limitations, the State has the same power to enter into contracts that any private person has, and is equally bound by the con-tracts into which it has entered ; and when it has become a party to negotia-ble paper, its liability is governed by the same principles of law that apply to other persons in that relation.

8. *Indorsed railroad bonds; character as negotiable instruments.*—The object and purpose of the indorsement of these railroad bonds by the State, under the statutes above mentioned, was to improve their credit, and to facilitate their currency. On their face, they are negotiable instruments by the general commercial law, which must be presumed to be of force in Boston, where they are made payable, and are capable of transfer by delivery ; and the State is liable as the indorser of such paper.

9. *Same; rights of holder.*—The bonds being negotiable, regular on their face, and reciting in the indorsement a compliance by the company with the conditions of the statute, an innocent holder for value is not affected by any fraud or mistake in their over-issue ; and the dishonor of the unpaid interest coupons would not charge him with notice of any defect in them.

10. *Same ; numbers on bonds.*—The statutes do not require that the bonds shall be numbered, nor that they shall be indorsed in numerical order, nor that they shall be sold or negotiated by the company in any particular order ; and the numbers on the several bonds do not indicate anything as to the time when they were issued or negotiated.

11. *Same; governor's refusal to pay interest on bonds of over-issue.*—The act of Governor Lindsay, in 1871, in refusing to pay interest on the bonds num-bered above 4,720, if held to be the act of the State, was strictly *ex parte,* and can not affect the rights of the holders of those bonds

12. *Alabama and Chattanooga Railroad Company's bonds; retirement of old bonds, in exchange for new, under act of February 23, 1876.*—The act approved February 23, 1876, authorizing the retirement of the bonds of the Alabama and Chattanooga Railroad Company, which had been indorsed by the governor in the name of the State, and the substitution of new bonds in their stead (Sess. Acts 1875-6, pp. 130-49), embraces and applies to all the indorsed bonds bearing date in 1869, and makes no distinction between those regularly issued and those reported by the "State debt commissioners" as "over-issue."

APPEAL from the City Court of Montgomery.
Tried before the Hon. JOHN A. MINNIS.

[The State, ex rel. Plock & Co. v. Cobb.]

This cause, or proceeding, was commenced by a petition under oath, filed on the 2d July, 1878, in the name of the State, on the relation of the persons composing the firm of Plock & Co., praying for a *mandamus* to the Hon. GEO. S. HOUSTON, then governor, and *ex officio* commissioner to complete the adjustment and settlement of the State indebtedness growing out of its indorsement of various railroad bonds, under several statutes hereinafter more particularly referred to ; commanding him, in the exchange of the new bonds, which he was authorized to issue for the indorsed old bonds of the Alabama and Chattanooga Railroad Company, to deliver to the relators two more bonds in addition to those which he had already allowed them, " so that said petitioners and relators shall receive said new bonds at the rate of $211.90 for each $1,000 of the principal sum of said indorsed first mortgage bonds" held by them, "and the interest thereon due and unpaid to the first day of January, 1876 ; and that he distribute of the said [new] bonds, to said petitioners, in the proportion which the amount held by them, as herein stated, including interest from the 1st day of January, 1872, bears to the aggregate composed of all said first mortgage indorsed bonds of the said railroad company, which are numbered *seriatim* and consecutively from one (1) to 4,720, inclusive, with the interest thereon due and unpaid on the 1st day of January, 1876." The relators were the owners and holders of ninety-seven of the indorsed first mortgage bonds of said railroad company, and they claimed that, in the exchange of the new bonds for the old, only the holders of the bonds numbered consecutively from one (1) to 4,720 were entitled to participate ; while the governor held that the additional bonds, numbered from 4,721 to 5,229, were equally entitled to share in the distribution and exchange. In reference to these matters, and the asserted rights of the relators in connection with them, the following are the material averments of the petition, or relation :

" Your petitioners, being the owners and holders of ninety-seven first mortgage indorsed bonds of the Alabama and Chattanooga Railroad Company, notified the said George S. Houston, governor as aforesaid, on or about the 29th day of June, 1877, by John Swann, their duly authorized agent, that they objected to and protested against the use or application of any of the bonds authorized by the 9th section of the said act approved February 23, 1876, in the retirement, exchange or extinguishment of any first mortgage bonds of said railroad company, other than such as are described in the 10th section of said act, or in retirement, exchange or

(9)

extinguishment of any first mortgage indorsed bonds of said company, which were not issued, indorsed and disposed of, in pursuance with the terms, requirements and conditions of the statutes specified in the 10th section of said act; and that your petitioners contended and insisted, that each of the so-called first mortgage indorsed bonds of said company, which were indorsed after the first mortgage bonds of said company had been issued and indorsed to the amount of $4,720,000, or which were issued in excess of that amount and indorsed afterwards, must be excluded from any exchange of bonds authorized by the 10th section of said act. Your petitioners further show that, since the 23d day of February, 1876," and after the new bonds had been prepared, " and after said notice was given to said Houston, your petitioners offered and tendered to said Houston, governor and commissioner as aforesaid, said ninety-seven first mortgage indorsed bonds owned and held by them, together with all the unpaid coupons attached or belonging to said bonds respectively, whether past due or to mature, of which your petitioners were the owners or holders, for exchange for the new bonds of the State, which were authorized and had been prepared in pursuance of, and in accordance with the 9th section of said act, and in the manner provided in the 10th and 12th sections thereof; and the said Houston, governor and *ex officio* commissioner as aforesaid, delivered to your petitioners bonds of the State prepared as aforesaid under the 9th section of said act, for the said ninety-seven first mortgage indorsed bonds so held and owned by them, at the rate of $191.24 of said new bonds for every $1,000 of the principal sum of said ninety-seven first mortgage indorsed bonds of said company, with the interest thereon due and unpaid to the 1st day of January, 1876; and refused to deliver to your petitioners any more or greater amount of said new bonds, in exchange for said ninety-seven bonds of said railroad company; claiming and pretending that there were 5,229 of the first mortgage indorsed bonds issued by said railroad company, amounting in the aggregate to $5,229,000, besides interest, and that all of said bonds were entitled to share in said exchange and distribution; whereas your petitioners show and state, that they were entitled to have and receive, in exchange for said ninety-seven bonds so held and owned by them, said new bonds at the rate of $211.90 for every $1,000 of the principal sum of said ninety-seven bonds and the interest due and unpaid thereon to the 1st day of January, 1876; at which rate, the said Houston, as such governor and *ex officio* commissioner, ought to have delivered said new

[The State, ex rel. Plock & Co. v. Cobb.]

bonds to your petitioners in making said exchange, and at which rate your petitioners insisted and demanded that said new bonds should be delivered to them in making said exchange.

"Your petitioners further show and state, that the so-called first mortgage bonds of said railroad company, which are numbered *seriatim* and consecutively from 4,721 to 5,229, inclusive, and which the said Houston claims and pretends are entitled to share in said exchange and distribution of said new bonds with said first mortgage indorsed bonds numbered *seriatim* and consecutively from one (1) to 4,720, inclusive, were not issued, indorsed and disposed of, in pursuance of, and in accordance with the requirements and conditions of the several statutes specified in said 10th section of said act. Your petitioners further show and state, that the entire road-bed of the said Alabama and Chattanooga Railroad Company, which was ever constructed, or completed, or which ever belonged to said company, is situated between Wauhatchie, in the State of Tennessee, and Meridian, in the State of Mississippi, and is not more than 295 miles ; and that all the so-called first mortgage bonds of said railroad company, which are numbered over and in excess of 4,720, and which purport to bear the indorsement of the State of Alabama, or in its name, do not legally and properly bear the indorsement of said State, or in its name ; and such purported indorsement, on any and all of said bonds last mentioned, was put thereon without authority of, and contrary to law, and said bonds are not entitled to share in said exchange of said new bonds, as authorized and provided by the 9th, 10th, and 12th sections of said act ; and your petitioners were and are entitled to have and receive from the said Houston, as governor and *ex officio* commissioner as aforesaid, two more of said new bonds authorized by the 9th section of said act, in exchange for their said ninety-seven bonds.    *   *   *
Your petitioners further show and state, that the bonds described in the 10th section of said act are the said first mortgage indorsed bonds of said railroad company which are numbered *seriatim* and consecutively from one (1) to 4,720, inclusive, and are the only bonds among and to the holders of which the said new bonds, authorized by the 9th section of said act, are to be distributed, in the proportion respectively which the amount held by said owners, including interest from the 1st day of January, 1872, bears to the aggregate composed of the principal of all said bonds numbered as aforesaid from one (1) to 4,720, inclusive, and the interest thereon due and unpaid to the 1st day of January, 1876.

The said ninety-seven bonds held by the petitioner were alleged to be all of the same form, tenor and date, differing only in their respective numbers, each being less than 4,720; and one of them was made an exhibit to their petition, in these words:

" *United States of America :* Eight per cent. first mortgage bond. Alabama & Chattanooga Railroad Company. No. 3,336. Know all men by these presents, that the Alabama and Chattanooga Railroad Company, a corporation existing under the laws of Alabama, Georgia, Mississippi and Tennessee, acknowledges itself indebted to the State of Alabama, or bearer, in the sum of one thousand dollars ; which sum it promises to pay to said State of Alabama, or bearer, in lawful money of the United States, at the National Security Bank of Boston, in the Commonwealth of Massachusetts, on the first day of January, A. D. 1889, with interest at the rate of eight per cent. *per annum,* payable semi-annually, on the first days in January and July in each year, on the presentation and delivery of the proper annexed interest warrants. This is one of a series of numbered bonds, issued in accordance with, and upon the conditions of an act of the General Assembly of Alabama, approved February 19th, 1867, and amended September 22d, 1868, entitled 'An act to establish a system of internal improvements in the State of Alabama, and which, in pursuance of said act, are secured by an indorsement of the State of Alabama, with power of sale, and by a first lien upon the entire road, including the stock, road-bed, right of way, grading, bridges, masonry, iron, rails, spikes, chains, and the whole superstructure and equipment, and all the property owned by the company as incident to, or necessary for its business, and depots, and depot-stations ; and said series may be issued to an amount not exceeding at the rate of sixteen thousand dollars per mile of said road. In witness whereof, this company has caused its corporate seal to be hereto affixed, and this bond to be signed by its president and treasurer, the first day of January, A. D. 1869." (Signed by D. N. Stanton as president, J. T. Burr as treasurer, and seal of corporation affixed.)

" State of Alabama : (State Indorsement.) In pursuance of certain acts of the General Assembly of the State of Alabama—namely, an act approved February 19, 1867, entitled 'An act to establish a system of internal improvements in the State of Alabama ;' and an act approved September 22, 1868, entitled 'An act to amend the law to establish a system of internal improvements in the State of Alabama ;' and an act approved November 17, 1868, entitled 'An act relating to

the Wills Valley Railroad Company and the North-east and South-west Alabama Railroad Company'—the State of Alabama hereby indorses this bond, and becomes liable for the payment of the principal and interest thereof; the Alabama and Chattanooga Railroad Company having complied with the conditions upon which the undersigned, governor of the State of Alabama, is required, on the part of the State, to give such indorsement. In witness whereof, the undersigned, governor of the State of Alabama, has hereto set his hand, and caused to be affixed hereto the seal of the State of Alabama, this first day of January, A. D. 1869." (Signed by W. H. Smith, as governor, and State seal affixed.)

"The Alabama and Chattanooga Railroad Company hereby agrees to pay the principal and interest of the within bond, in current money of the United States. In witness whereof, the said corporation has caused its corporate seal to be hereto affixed, and these presents to be subscribed by Daniel M. Stanton, its president, hereto duly authorized, on this, the 26th day of January, A. D. 1869." (Signed by said Stanton, and corporate seal affixed.)

The act approved February 23, 1876, above referred to, under which said new bonds were authorized to be issued, and which may be found at length in the Session Acts of 1875–6, pp. 130–49, is entitled "An act to ratify and confirm the settlement of the existing indebtedness of this State, as proposed in the report of the commissioners appointed under the act approved 17th December, 1874, and which was communicated to the General Assembly by message of the governor of 24th January, 1876, and to carry said settlement into effect by the issuance of new bonds of this State, at a reduced rate of interest, in adjustment of a portion of said indebtedness, and the surrender of certain securities held by the State, in discharge of another portion of said indebtedness." The material portions of said act, bearing on the present controversy, are the preamble, and the 9th, 10th, 11th, and 12th sections, which are in the following words:

"*Whereas*, the State of Alabama is indebted to sundry parties, the holders of bonds heretofore issued by it, and certain claims are alleged against it, by reason of certain indorsements of other bonds by this State, issued by the Alabama and Chattanooga Railroad Company, and also for money loaned to the State, constituting the indebtedness of the State existing on the 6th day of December, 1875; and upon which a large arrearage of interest remains unpaid, and which it is the interest alike of the said State and of the

holders thereof to adjust in such manner that no question of dispute may hereafter exist, and no default in payment of future accruing interest may occur : *And whereas,* a scheme for adjustment thereof has been considered on the part of this State by commissioners appointed under the act approved 17th of December, 1874, entitled 'An act for the appointment of commissioners to liquidate and adjust all claims against the State of Alabama arising from bonds issued or indorsed in the name of the State,' and the same has been accepted by a large proportion of the holders of such claims, and is now recommended by the said commissioners to be adopted by the State ; all of which appears in the report of said commissioners, which was communicated to the General Assembly by the governor's message dated January 24th, 1876 : *And whereas,* said adjustment is such as the State may wisely accept and ratify, as a settlement of its liabilities growing out of bonds heretofore issued by and indorsed in the name of the State, as presented in said report of said commissioners, and as will do justice between the State and the holders of the several claims hereinafter named: *Therefore*—

"SECTION 1. *Be it enacted by the General Assembly of Alabama,* That the provisional plan of settlement of the existing indebtedness of this State, as proposed by the report of the commissioners appointed under the act named in the preamble to this act, and communicated to the General Assembly by the message of the governor under date of January 24, 1876, be, and the same is hereby, approved and accepted; and to carry the same into effect, the governor of this State is hereby authorized and empowered to cause to be prepared bonds of the State of Alabama, to an amount not exceeding in the aggregate seven millions of dollars." (These bonds, as the first section of the act further provides, after specifying the rate per cent. of interest and other particulars, are to be designated as *"Class A;"* and they are to be used and applied, by the governor and commissioners, in exchange and substitution for other bonds and debts, particularly described in the first five sections of the act. In like manner, the 6th section provides for the issue of another series of bonds, to be known and designated as *"Class B,"* and which were to be used in exchange and substitution for other bonds and debts, particularly described in the 6th, 7th, and 8th sections. As to these bonds, *"Class A"* and *"Class B,"* no question is raised in this case ; and it is therefore unnecessary to set out these sections of the act.)

"SEC. 9. *Be it further enacted,* That the governor of this

State be, and he is hereby, authorized and empowered to cause to be prepared a further series of bonds of the State of Alabama, to be designated as *'Class C,'* and numbered from number one (1) to number one thousand (1,000). Each of said bonds shall be for the sum of one thousand dollars, and the total amount shall be *one million dollars.* Said bonds shall be dated the 1st day of January, 1876, and shall bear interest from that date, for the first five years from their date, at the rate of two (2) per cent. *per annum,* [and] thereafter at the rate of four per cent. *per annum,* payable semi-annually, on the 1st day of July and January in each year during the time for which said bonds are to run. Said bonds shall be made payable thirty years after their date, and be renewable, at the pleasure of the State, for another period of thirty years; but, during that extended period, shall bear interest at the rate of five per cent. Principal and interest of said bonds shall be payable, in lawful money of the United States, in the city of New York. In all respects other than mentioned in this section, said bonds, in their mode of issue, execution, registry, shall conform to the requirements mentioned in the first section of this act; except that the certificate therein required to be made upon said bonds, by at least one of the commissioners, if the exchange hereinafter provided for be made in London, may be made upon said bonds by the agent who may be appointed to make said exchange in that city, whether he be one of said commissioners or not.

" SEC. 10. *Be it further enacted,* That said commissioners under said act of 17th December, 1874, are authorized and empowered to use and apply said bonds which are authorized by the 9th section of this act, only in retirement and exchange and extinguishment of the first mortgage indorsed bonds of the Alabama and Chattanooga Railroad Company, which bear date in 1869, and were issued, indorsed and disposed of, in pursuance of, and in accordance with the terms, requirements and conditions of the following named statutes of this State—that is to say, an act approved February 19, 1867, entitled 'An act to establish a system of internal improvements in the State of Alabama;" an act approved September 22, 1868, entitled 'An act to amend the law to establish a system of internal improvements in the State of Alabama;' and an act approved September 17th, 1868, entitled 'An act relating to the Wills Valley Railroad Company, and the North-east and South-west Railroad Company.'

" SEC. 11. *Be it further enacted,* That the exchange authorized in the next preceding section shall be made in the city

of London, or in the city of New York, as the holders of the bonds authorized by said preceding section to be received in exchange may elect; but such election must be certified to the governor of this State, within six months after the passage of this act, or he may elect at which of said cities such exchange shall be made. Such exchange as may be made at London, shall be effected under the superintendence jointly of an agent to be appointed by the governor of this State, and at the expense of the State, and an agent to be appointed by the council of the corporation of foreign bondholders, which is a corporation established in said city of London, and at its expense. But the expense of printing and preparing for exchange the bonds authorized by the 9th section of this act, shall be paid by this State.

" SEC. 12. *Be it further enacted,* That the exchange of said bonds which is authorized by the 10th section of this act, shall be made in such manner that the said million of dollars, principal expressed on the face of the said thousand bonds, shall be in full payment and discharge of this State of all liability, claim and demand whatsoever against it, of, upon, and by reason of said bonds described in the 10th section of this act; so that, from and after the issue of said one thousand new bonds, this State shall and will forever be and remain fully, completely and entirely freed and discharged of all liability, claim and demand for principal and interest, and any portion of either, by any person or persons, corporation or corporations whatever, for or on account of any indorsement by any officer or agent of the State, or any person acting in its name, on or upon any, every, and all bonds made or issued by the said Alabama and Chattanooga Railroad Company, bearing the indorsement thereon of this State, or in its name. Said exchange shall be made in such manner, that the bonds by the 9th section of this act authorized shall be distributed among and to the several holders of the bonds described in the 10th section of this act, in the proportion respectively which the amount held respectively by said owners, including interest from the 1st day of January, 1872, bears to the aggregate composed of the principal of all the bonds described in said section, and the interest thereon due and unpaid to the 1st day of January, 1876; but no portion of the bonds described in the 9th section of this act shall be delivered by the said commissioners, or by any agent appointed to make the exchange in this act directed, unless the bonds themselves herein authorized to be received, and which are described in the 10th section of this act, be surrendered to said commissioners or agents, and the unpaid

coupons respectively, whether attached to said bonds or not, and whether past due or to mature. But, if any of said bonds or coupons, or bonds and coupons, in this section directed to be surrendered to said commissioners or agents, before issued to the holders thereof of these new bonds, shall have been used in payment of any purchase of the property of said Alabama and Chattanooga Railroad Company, under the decree of foreclosure and sale of the same by the Circuit Court of the United States for the fifth judicial circuit, at Mobile, by the holders thereof, and the same have been cancelled, by order of said court, and remain deposited therein as a part of its records; as to them, the certificate of the clerk of said court, under the seal thereof, specifying the description, numbers and amount of said bonds and coupons, or bonds or coupons, so paid and cancelled, and that they have been paid and cancelled, shall be received by said commissioners or agent, and regarded the same as if the bonds and coupons in said certificate described were then, and to them, surrendered; and such certificate, so received, shall be returned by said commissioners, with certificate by them or the agent to exchange indorsed thereon, of the facts attending the receipt by them or him of said certificate by said clerk of said Circuit Court."

Governor Houston filed an answer, or return, to the alternative writ served on him, admitting his refusal to allow to the petitioners, in exchange for their old bonds, any more new bonds than they had received, as stated in their petition; and he justified his action under the construction which he placed on the said act under which the new bonds were issued. He admitted that "all of said railroad, that was ever constructed and completed, is not longer than two hundred and ninety-five miles;" and alleged that the railroad company issued, in addition to the bonds numbered consecutively up to 4,720, other bonds numbered from 4,721 to 5,229, inclusive; that all of said additional bonds "bear the same date, being dated in January, 1869, and are precisely similar in all other respects, except as to their numbers, as the bonds first mentioned, and bear precisely similar indorsements; and all of said bonds, those numbered above, as well as those numbered below 4,720, alike purport to be issued and indorsed in pursuance of, and in accordance with the terms, requirements and conditions of the said several statutes mentioned and referred to in said writ, and all were claimed and alleged to be liabilities, claims and demands, valid and existing against the State of Alabama on the 23d day of February, 1876." Alleged, also, that the commissioners appointed to adjust the State indebtedness, in their

report to the governor, "reported among the contingent lia-
bilities of the State, on account of aid to railroad companies,
the indorsed bonds of the Alabama and Chattanooga Rail-
road Company to the amount of $5,300,000, including therein
all of the said bonds hereinbefore mentioned," and proposed
the issue of new bonds, to the amount of $1,000,000, in satis-
faction of all liability on account of any and all of these
bonds, without any discrimination between them; and a
copy of the commissioners' report was made an exhibit to
his answer.   He further alleged that, before he was notified
by the petitioners' agent of their claim, as set forth in their
petition, the holders of the bonds numbered above 4,720 had,
through their agents and attorneys, presented their said
bonds to him, and offered to surrender them in exchange for
new bonds, and claimed a right to participate in the distri-
bution of the new bonds.   "All of said bonds, thus presented
to this respondent, bear date the 1st day of January, 1869,
and are for $1,000 each, payable on the 1st day of January,
1889, and have coupons attached, payable on the 1st days of
July and January in each year, and contain the same indorse-
ments.   The holders of said bonds claim and insist that they
are embraced within the terms and description of said act
approved February 23d, 1876; that in the issuance and in-
dorsement of said bonds, all the terms, requirements and
conditions of the several statutes mentioned and referred to
in said petition and writ, have been complied with; that
said bonds were authenticated by the corporate seal of said
railroad company, by the signatures of its president and
secretary, the certificates of at least two of the trustees, the
signature of the governor of Alabama, and the State seal of
Alabama, and were thus authenticated at the time they pur-
chased said bonds; that they are *bona fide* purchasers of said
bonds, for a valuable consideration; that they are liabilities,
claims and demands against the State of Alabama; and that
they, as the owners and holders thereof, are entitled to have
their respective proportion of the new bonds authorized by
the 9th section of said act of February 23, 1876; and that it
was the duty of this respondent, under said act, to exchange
said new bonds with them in the proportion prescribed by
said act.   Respondent states, that such have been and are
his own views, as between themselves and the other holders
of said bonds, of the rights of said parties, and of his duty
in respect to them as the owners and holders of said bonds,
and that they are entitled under said act of 23d February,
1876, equally with the petitioners and the holders of the other
bonds of said company numbered up to 4,720, to participate
in the distribution of the said new bonds.   Respondent

[The State, ex rel. Plock & Co. v. Cobb.]

thereupon denies " that he has in any respect violated the provisions of the said act approved 23d February, 1876, or the duties imposed on him by that law in the exchange and distribution of the new bonds.

In the report of the commissioners appointed to investigate and adjust the State debt, or to propose an adjustment thereof, as shown by the exhibit annexed to the answer or return, the bonds indorsed for the Alabama and Chattanooga Railroad Company are included in "*Class Four: Indorsed Bonds,*" and their amount is thus stated: "Alabama and Chattanooga Railroad, $4,720,000; Alabama and Chattanooga Railroad, over-issue, $580,000." In reference to these bonds, the report contains the following statements and suggestions :

"What shall be done with this class of alleged liability, or contingent indebtedness?" referring to all the railroad bonds included in "*Class Four.*" · "In the case of the Alabama and Chattanooga Railroad Company, authority was given to, and the duty imposed upon Governor Lindsay, by an act approved 8th March, 1871, to ascertain upon what bonds of the company the State was liable as indorser, and to borrow money to remove the default of the company in the payment of interest due on such bonds. Governor Lindsay, in the exercise of the authority conferred on him by that act, decided that $4,720,000 of the bonds had been legally indorsed ; and he paid the semi-annual interest due on the 1st January and 1st July, 1871, and 1st January, 1872. Moreover, under the provisions of the 'State Aid' law, Governor Lindsay took possession of the road and equipments, and, through agents appointed by him, operated it during part of 1871 and 1872. The State thereby asserted its right to seize the road ; and it may be contended that it admitted its obligation to protect its indorsements, and that it is estopped by its action from interposing the defense to which we have referred. It is true, also, that the General Assembly, by its enactments, authorized Governor Lewis and Governor Lindsay to sell said road and equipments, and each of them did endeavor to make a sale. These various recognitions by the State seem to forbid the defenses which many believe could be interposed, and we do not think the duty is enjoined on us to sit in judgment upon the solemn acts of the General Assembly. It is claimed, by the holders of the indorsed bonds of this company, that great detriment to them resulted from the unskilled management of the road while it was in possession of the State, and that they are entitled to some indemnity for injury to property which was mortgaged to them. We admit that there is some plausibility in this plea for com-

[The State, ex rel. Plock & Co. v. Cobb.]

pensation; but, to what extent the bondholders were injured by the action of the State, has not been, and can not be accurately ascertained.

"In view of all the facts and allegations to which we have referred, and to the act of the General Assembly approved March 8th, 1871, which we feel bound to respect, we regard this as a case not entirely devoid of equity, and one which should be settled by a fair compromise. We have therefore entered into an agreement with T. W. Snagge, esq., of London, agent of the holders of about $3,300,000 of the indorsed bonds of the Alabama and Chattanooga Railroad Company, under and by which, if approved by the General Assembly, the State will be relieved of many millions of dollars of contingent liability, and thereby quiet demands which might give the State future annoyance. In full satisfaction of all liability on account of indorsements for that company, and of all other claims or demands on account of said road, we propose that the State pay $1,000,000, in bonds having thirty years to run, and bearing interest at the rate of two (2) per cent. per annum for five years, and four (4) per cent. for twenty-five years; renewable, at the option of the State, for thirty-years, at five (5) per cent. per annum. The bonds and coupons are to be made payable in the city of New York, in lawful money of the United States. The rate of interest is fixed at two (2) per cent. for five years, in consideration of the remission of such unpaid taxes as were due from the company on the 30th September last. For further particulars of this agreement, we refer you to 'Exhibit B.' This agreement, if consummated, taken in connection with a sale of the lands mortgaged to the State to secure the payment of the $2,000,000 of 'straight bonds' loaned to the company, the terms of which will be seen by reference to 'Exhibit C,' will retire about $9,000,000 of contingent liability, and put at rest all controversy and anxiety on account of the connection of the State with this ill-fated company. * * * We recapitulate the indebtedness of the State, direct and contingent, as follows: Amount in class one, $11,667,470; do. in class two, $1,156,000; do. in class three, $2,573,093; do. in class four, $14,641,000; total, $30,037,563. To recognize every claim preferred against the State, would render the payment of interest, to say nothing of the principal of such an enormous debt, utterly impossible, even at a very low rate. It would be to acknowledge an indebtedness equal to one-fifth of all the property of the people; and to provide for the annual interest which would accrue, would require a tax, if not inhibited by the constitution, which would be tantamount to confiscation. It is apparent, therefore, that a

just and honorable compromise is indispensable. Unjust claims must be rejected, and those which are acknowledged must necessarily be reduced."

"Exhibit B" to this report is dated the 22d January, 1876, and is signed by Governor Houston, L. W. Lawler and T. B. Bethea, as commissioners on the part of the State, and by T. W. Snagge as the agent of the English bondholders. The following extracts are the only portions of it which appear to be material : "The following are the terms of a proposed settlement by way of compromise, arrived at after prolonged discussion, between the governor of Alabama, the commissioners appointed under the statute of the General Assembly of Alabama of December 17th, 1874, entitled 'An act for the appointment of commissioners to liquidate and adjust all claims against the State of Alabama arising from bonds issued or indorsed in the name of the State,' and Mr. T. W. Snagge, the standing counsel of the corporation of foreign bondholders, acting under instructions from the council of the corporation, to confer with said governor and commissioners. The settlement by way of compromise, herein referred to, is in respect of *the first mortgage indorsed bonds* of the Alabama and Chattanooga Railroad Company of 1869, issued, indorsed and disposed of, in pursuance of, and in accordance with the terms of certain statutes of the General Assembly of the State of Alabama, namely," specifying the respective dates and titles of the three acts of 1867 and 1868 above mentioned. "With respect to the first mortgage indorsed bonds of the · Alabama and Chattanooga Railroad Company of 1869, above mentioned and described, the governor and commissioners are willing to submit the following terms of settlement to the legislature for ratification : 1st. The amount of principal and over-due interest, up to and including the half year's interest due on the 1st January, 1876, to be added together ; and the gross amount, so ascertained, shall be deemed to be the amount of indebtedness to be dealt with under this head." 2. "The governor and the State of Alabama will forthwith transfer and assign to the holders of the bonds and coupons, or to representatives in their behalf, all rights, powers, title and liens of every description, whether existing by statute or otherwise, and possessed by the State or the governor, in respect of the Alabama and Chattanooga Railroad, upon the property embraced in the mortgage under which the bonds were issued ; and this settlement is to be taken as an extinguishment only of the direct liability of the State upon said bonds, but shall have no effect upon or in extinguishment of any lien in favor of the State heretofore in any manner created for the pay-

ment of the liability assumed by the State upon the said bonds; but such lien shall be retained and kept alive solely for the benefit of such of the first mortgage bondholders as may become purchasers of said railroad" under a decree of the Circuit Court of the United States sitting at Mobile, "as against all persons who are not entitled to participate as purchasers in the benefits of said first mortgage; and the said purchasers shall be clothed with full power, as a company, to assert and enforce the same, as the State might at any time have done prior to this settlement." 3. "An amount of new State direct bonds, bearing interest from the 1st day of January, 1876, shall be created and issued, and shall be applied in retirement of the bonds and coupons forming amount of indebtedness referred to in paragraph one (1)." 4. "The amount of the new State bonds to be issued as aforesaid shall be for one million of dollars, in one thousand bonds, of one thousand dollars each;" and the other stipulations refer to the rate of interest, the form of the new bonds, &c.

The relators demurred to this return, assigning specifically eleven causes of demurrer; but the court overruled the demurrer, and held the return sufficient. They then filed five separate replications to the return, to all of which demurrers were sustained by the court. The relators declining to plead further, the court rendered final judgment against them, and refused to grant a peremptory *mandamus*. The demurrers and replications present only questions of law arising on the facts above stated. The final judgment, and the several rulings of the court on the pleadings, are now assigned as error.

Governor Houston's term of office having expired after the appeal was sued out, the cause was revived, by consent, against Governor R. W. Cobb, his successor in office.

CLOPTON, HERBERT & CHAMBERS, RICE, JONES & WILEY, and BRAGG & THORINGTON, for appellants.—1. The return is insufficient, and the demurrer to it should have been sustained.—*State v. Lean*, 9 Wisc. 279; *Levy v. Inglish*, 4 Ark. 65; *People v. Killduff*, 15 Illinois, 502; *Harwood v. Marshall*, 10 Maryland, 451; High on Ex. Remedies, §§ 464, 470-72, and authorities cited.

The act under which the commissioners were appointed, defines their duties as follows: "to inquire of, ascertain, liquidate and adjust the subsisting legal liabilities of the State of Alabama on bonds issued and indorsed in the name of the State, and the coupons on the same, in such manner

[The State, ex rel. Plock & Co. v. Cobb.]

as the interests of the State may require ; " but it was further provided, that the adjustment should not be binding on the State, "unless and until approved and ratified by the General Assembly." In the report of the commissioners, these 424 bonds, the validity of which is claimed in the return, are described as "over issue ;" and their adjustment is nowhere recommended. On the contrary, after enumerating all the claims against the State in the shape of bonds, they say : "Unjust claims must be rejected, and those which are acknowledged must necessarily be reduced." With the report, and as part of it, the commissioners submit the settlement they had made with Snagge ; which settlement, by its recitals, relates only to the "first mortgage bonds of the Alabama and Chattanooga Railroad Company of 1869, issued, indorsed and disposed of, in accordance with the terms of certain statutes," &c., naming the statutes which are mentioned in the 10th section of the act of February, 1876 ; and this 10th section of said act provides, that the new bonds, authorized by the 9th section to be issued, shall be used "*only* in retirement, exchange and substitution of the first mortgage indorsed bonds of the" said railroad company, "which bear date in 1869, and were issued, indorsed and disposed of, in pursuance of, and in accordance with the terms, requirements and conditions of the following named statutes," naming the same statutes that are recited in the said contract. By using this language, so nearly identical with that employed by the commissioners, and so marked by positive and explicit requirements, the General Assembly evidently intended to confine the distribution of the new bonds to the particular class of bonds which this language describes, and to exclude "unjust claims," which this "over issue" had been determined to be by both the legislative and the executive departments of the State government. Every feature of the statute of February 23d, 1876, is consistent with this idea, and inconsistent with any other. The General Assembly, by the act of March 8, 1871, had clothed Governor Lindsay with power to investigate the bonds indorsed for this company by the State, and to pay interest on such as were held by "innocent and *bona fide* purchasers of valid claims against the State ;" and Governor Lindsay, in the exercise of this power, did investigate, and pay interest on all bonds which, after investigation, he found to be valid claims ; which action was reported by him to the General Assembly, and was expressly ratified by that body.—Sess. Acts 1871-2, p. 12, § 3.

2. If a statute is plain and unambiguous in its terms, it is its own best expositor, and nothing outside of its own provisions can be looked to, in arriving at its meaning and con-

struction; while, if it is ambiguous, and its meaning doubtful, the courts, in construing it, can look to "no extrinsic fact prior to the passage of the bill, which is not itself a rule of law, or an act of legislation."—Sedgw. Const. & Stat. Law, 208, 209; *Leese v. Clark*, 20 Cal. 387, 425; *Taylor v. Taylor*, 10 Minn. 107; *Delaplane v. Crenshaw*, 15 Gratt. 457. The act of February 23, 1876, is plain and unambiguous in its provisions; but, whether construed by itself alone, or in connection with the rules of law and legislative acts above referred to, the result is the same. The "over issue" of indorsed bonds is nowhere recognized or provided for by the statute, either expressly or by implication. No more distinct and emphatic language could have been used, than is used in this 10th section, to negative the idea that these bonds, which had already been repudiated by the governor and the legislature, should be allowed to participate in the bonds of the new issue. By no force of words can these repudiated bonds, described as "over issue," be held to have been issued, indorsed and disposed of, "in pursuance of, and in accordance with the terms, requirements and conditions" of the statutes specified. The terms are repugnant and antagonistic to each other; and when the new bonds are, by a further express declaration, to be distributed *only* among the bonds so issued, indorsed and disposed of, the "over issue" must necessarily be excluded. Positive words, and the necessary implication from the negative words used, alike lead to this construction.

3. In full satisfaction of "all liability on account of indorsements for that company," as those words are used in the report of the commissioners, must be taken in connection with the contract with Snagge; and the General Assembly have not only shown what they understood the words to mean, but have expressly limited the new bonds to "liability on account of indorsements for that company." The additional words used in the report, on which great stress is laid in the return—"all other claims or demands on account of said company"—evidently refer to the claim for damages, or compensation, on account of injuries resulting from the unskilled management of the road by the agents of the State, and have no allusion to the bonds illegally issued; and this is the claim which is said to be "not devoid of equity," and "which should be settled by a fair compromise."

4. The 12th section of the statute is also relied on, in the return, as justifying the action of the governor. But this section expressly refers to the 10th section, and declares that the new bonds shall be in full payment and discharge of all liability by the State "upon and by reason of said bonds described in the 10th section of this act;" and the more gen-

eral words which follow, in the 12th section, must, by the settled rules of construction, be referred to the particular matter with which they are connected, and by which they are to be controlled and restrained.— *Grumley v. Webb,* 44 Missouri, 456; *Louis v. Laughlin,* 49 Missouri, 559; 4 Maule & Sel. 423; *State v. Goettze,* 22 Wisc. 363; *Sanderson v. Beach,* 7 Barn. & Cr. 100; *White v. Ivey,* 34 Geo. 186; 52 Penn. St. 391; Smith's Comm. Stat. 656; 2 Parsons on Contracts, 494, 5th ed. Besides, the explicit instructions to the commissioners making the exchange, afterwards set out with particularity and precision in said 12th section, require that the new bonds shall be distributed by them "among and to the several holders of the bonds described in the 10th section of this act;" and the same idea is further expressed by the language used in the 14th section; so that the question recurs, whether the bonds of the "over issue" are included in the bonds mentioned and described in said 10th section. In law, matter of description is always regarded as vitally material. In the bonds referred to in the 10th section, at least two distinct, descriptive phrases are used, and each is equally material in identifying the bonds: 1st, they must "bear date in 1869;" 2d, they must have been issued, indorsed and disposed of, "in pursuance of, and in accordance with the terms, requirements and conditions" of the several statutes specified. Neither of these descriptive averments can be ignored or disregarded, either by the governor, or by the courts. Bonds issued in any other year than 1869, though conforming to all terms and requirements of the statutes, can not be included in the exchange; and the bonds of the "over issue," though bearing date in 1869, are equally excluded. If they were issued &c., "in accordance with the terms, requirements and conditions" of the statutes, they could not be an "over issue." Nothing less than an express declaration in the act of February 23, 1876, particularly describing these illegal bonds, and directing the commissioners to adjust them, would authorize any commissioner to do so, or any court to hold that such was the legislative intention.

5. That the governor ascertained and determined, when he made the indorsements on the bonds of the "over issue," that all the preliminary requisites of the statutes had been complied with, and that the State is bound by his act and decision, are propositions which can not be maintained in this case. In the first place, this is not a suit against the State, nor has the State, as a party, submitted itself to the jurisdiction of the court; nor can its rights be affected by any adjudication of the court in this case. It is the case of a special appropriation, for a specific purpose, made by the

State to carry out a proposed contract with certain of its creditors. These creditors are described as a class in the 10th section of the statute ; the contract is set forth in the 9th, 10th, and 12th sections ; and the appropriation is made upon "the terms, requirements, and conditions" specified in the statute—that is, in the statutes mentioned by date and title, which makes them a part of that statute and proposed contract, as if therein fully set forth. Therefore, any person, claiming to avail himself of the benefit of the proposal, must show that he is one of the persons to whom the proposal is made—that he is one of the creditors particularly described and provided for. No commissioners can change the proposed contract ; no court can alter it, nor dispense with any of its requirements, nor extend its provisions to any other persons than those named.

6. The return, as a pleading, must be taken most strongly against the pleader.—*People v. Killduff*, 15 Ill. 502. It does not show that the holders of these bonds of the "over issue" are *bona fide* purchasers for valuable consideration without notice of the fact of "over issue ;" and therefore it must be taken that they had such notice—that they are affected with notice of the invalidity of the indorsements, because no one had any power to make the indorsement of the State upon the bonds, except in the manner, and upon the requirements and conditions of the public statutes, with which all the holders of these bonds are affected with notice.—*Broderick's Will*, 21 Wall. 518.

Besides, this doctrine, as to the determination by the governor that there had been a compliance with the preliminary requisites of the statutes, is confined exclusively to the curing of irregularities in the exercise of an unquestioned power, and can not be invoked to create power and authority ; while the objection to the indorsement of these bonds goes to a total denial of all power or authority to make them. The governor's power to indorse bonds was special and limited ; when he had indorsed bonds to the amount of $4,720,000, for a road only 295 miles long, his power was exhausted ; and any subsequent indorsement, as shown by the numbers of the bonds, was a palpable usurpation, and void for the want of power to make it. Neither the governor, nor any other officer or agent, can create or impose any obligation or liability on the State, by any act not authorized by law.—*Van-Dyke v. The State*, 24 Ala. 81 : *Governor v. Walker*, 22 Ala. 116 ; *Floyd Acceptances*, 7 Wallace, 666. If the over issue of bonds had reached $50,000,000, no one would contend that the State was bound by them ; and the same rule and principle must apply to the over issue of $580,000. The limit was

[The State, ex rel. Plock & Co. v. Cobb.]

reached, and the power was exhausted. when bonds were issued to the amount of $4,720,000; and any excess was absolutely void, without regard to its amount.

7. The return seems to assert that the holders of these illegal bonds are entitled to protection as *bona fide* purchasers for valuable consideration without notice; but the averments are wholly deficient for that purpose. The words "without notice" are entirely omitted, and the omission is significant. Nor is it averred, as a fact, that they are such purchasers, but only that they "claim" to be. But, if the averments were technically sufficient to present the question, the return would be fatally defective. Whether they are innocent purchasers without notice or not, is a question not involved in the case. The only question is, whether they belong to the class of creditors with whom the State proposed, by the terms of this statute, a compromise and settlement; in other words, whether the bonds held by them were issued, indorsed, &c., in accordance with the terms and conditions of the several statutes.

8. No argument can be made, in favor of these bondholders, from the State's asserted right of lien and seizure of the road. These indorsements, being void, neither conferred any right, nor created or imposed any liability; nor did the State ever exercise, or claim, or attempt to exercise, any right of lien or seizure on account of these bonds of the "over issue": on the contrary, while repudiating them, it did claim a lien on account of the bonds which it had indorsed, and seized the road under this claim. And this lien, with all the rights growing out of it, is preserved "for the protection and benefit of the holders of the bonds" &c. "described in the 10th section of this act."

9. On the principles and authorities above set forth, the court below erred in its rulings and judgment, and this court should render the proper judgment, and award a peremptory *mandamus*.—See authorities cited to 1st paragraph. That *mandamus* is the proper remedy, see *Tenn. & Coosa Rivers Railroad Co. v. Moore*, 36 Ala. 371; 2 Brickell's Digest, 240, and cases cited.

JOHN LITTLE SMITH, *contra.*—1. The claim asserted by the relators, in their petition, is their right to have two more bonds than have been allowed them by the governor; and if the petition does not show that they have this right, they have nothing to complain of. This claim is founded on the assumption that the entire length of the road is 295 miles, and the amount of valid bonds, at $16,000 per mile, $4,720,000. But there is no averment that the road is 295 miles in length:

the averment is, that it is "not longer than 295 miles ;" but its exact length is not stated. The distance between its two termini proper, Chattanooga and Meridian, is 295 miles ; but the road was never constructed between Chattanooga and Wauhatchie, and, as matter of fact, the road is not 295 miles long. These facts are outside of the record, but they explain the defective averment ; and if facts outside of the record can be assumed, the court will assume a judicial knowledge of the actual facts as they exist. So far as the averments of the petition go, the road may not be 100 miles long ; and hence the court can not, from the petition, make any calculation founded on the length of the road ; and unless it is 295 miles in length, the petitioners are not, under their own argument, entitled to two more bonds.

2. The bond exhibited says it is one of a series, but not that it is of a series of 4,720. All the bonds bear the same date, and are manifestly of the same series ; but there is nothing on their face to show the number of which the series consists. The acts mentioned in the indorsements on the bonds declare, that the indorsement shall be sufficient evidence, to the *bona fide* purchaser, that it is within the limits of the series authorized. The statute did not require the bonds to be numbered at all ; and although the numbers may indicate the order in which they were signed, they can not indicate the order in which they were sold ; and yet, if the validity of the bonds is to be determined by the actual length of the road, the bonds first sold, within the limits of the series, would be the valid and legal bonds, without regard to the numbers on them. The statute contemplated that the whole amount of the bonds authorized by it should be put on the markets of the world for sale, and this was in fact done ; but the bonds sent to London for sale, although numbered higher than those sent to Paris, might be first sold. Can the purchaser of a bond be charged with notice of the order in which the bonds are sold? Must he conclude that they are sold in the order of their numbers? It was to the interest of the State that the bonds should produce as much money as possible ; and if each purchaser was bound to inquire into the length of the road, and to ascertain how many of the bonds had already been sold, the object of the law would be frustrated, and the value of the bonds greatly impaired, if not altogether destroyed.

3. In the adjustment of the State indebtedness, the State was not dealing with the railroad officials who had procured this excessive issue of the bonds, nor with its own officers and agents who had been guilty of any violation of duty in issuing them : it was dealing with the holders of the bonds,

who were asserting them as valid claims against the State; and this fact is material in construing the statute, and all the proceedings connected with its passage. The statute was intended to adjust and settle the liability of the State, growing out of its indorsement of bonds for railroad companies, and "thereby quiet demands which might give future annoyance," as the report says; whether this annoyance were caused by possible suits in the future, or by a taint on its commercial name. To whom the million dollars of new bonds should go, was a matter of indifference to the State; but that they should be so distributed, in the language of the report, that they should be received "in full satisfaction of all liability on account of indorsements for that company, and of all other claims or demands on account of said road," was a matter of great moment. To exclude the holders of the high-numbered bonds from the benefit of the compromise and settlement, would effectually defeat the declared purpose of the proposed settlement. Plock & Co. made no settlement with the commissioners, nor were they represented by Snagge in the settlement which he made. He represented only the corporation of foreign bondholders, whose claims aggregated about $3,000,000; while Plock & Co. are American bondholders, and can only claim the benefit of the statute as these other bondholders do. To exclude these bonds from the exchange, would make the State repudiate its liability by an act designed to avoid repudiation; nor would the exclusion definitely settle the question of its liability, or prevent these creditors from continuing to ask and demand payment.

4. But the high-numbered bonds were subsisting legal liabilities of the State, at the passage of the statute under which the commissioners were appointed, and are therefore entitled to claim the benefit of the proposed settlement. Under the statutes providing for the issue of bonds to this railroad company, they were required to be made payable to bearer, and that is their form. That such bonds are negotiable instruments, is abundantly shown by the following authorities: *Mercer County v. Hackett*, 1 Wallace, 95; *Murray v. Lardner*, 2 Wallace, 120; *Moran v. Miami*, 2 Black, 731; *Supervisors v. Schenck*, 5 Wallace, 783; *Gelpcke v. Dubuque*, 1 Wallace, 206; *Comm'rs v. Aspinwall*, 21 Howard, 545; *Grand Chute v. Winegar*, 15 Wallace, 371. Although the statute provided that the bonds to be issued should not exceed $16,000 per mile, yet it also provided, so far as the State and the public, to whom the bonds were to be offered, were concerned, the evidence by which this limitation was to be determined; the tribunal to be satisfied by it, and to deter-

mine whether the bonds were within such limitation; the mode in which the decision of that tribunal should be authenticated; the punishment to be inflicted on those persons who might fraudulently impose on that tribunal; and a means of redress for the consequences of fraud which might make the State liable; and a first lien, or mortgage on all the property of the company, was provided for, "so soon as the governor, on the part of the State, shall indorse the bonds." The liability of the State arises, on its indorsements, so soon as the bonds come to the hands of a *bona fide* holder for value; and the lien then becomes operative. The holders of these bonds, having acquired them before maturity, are presumptively *bona fide* holders for value; with notice, of course, of the provisions of the acts under which the bonds were issued, and also of the judgment, certificate and authentication, necessary to make the indorsement binding, and of the unusual safe-guards provided against an over issue. When issued, under the provisions of this law, these bonds were authenticated by the corporate seal, by the signatures of the president and treasurer, by the certificate of at least two of the trustees, by the signature and certificate of the governor, and by the seal of the State of Alabama; and the governor's certificate states that the railroad company has complied with all the conditions on which he is required to make the indorsement. Where negotiable bonds are issued under an act of the General Assembly, which is referred to in the face of the bond, and which confers a power to issue bonds, and provides the manner of proving the due execution of that power, and the tribunal to determine that matter; and the due execution was so determined, and the authentication of such due execution is indorsed on the bond; such adjudication is final, as to the due execution of the power, in favor of a *bona fide* holder of the bond. It seems to be settled, also, that a mere limitation upon the amount of the bonds to be issued, contained in a resolution of the company issuing them, is not like the imposition of a certain formality of manner in the execution; and that *bona fide* holders have a right to infer that they were lawfully issued, and that the recitals are a conclusive estoppel against setting up the non-performance of the conditions.—*Trustees v. Strong*, 6 Otto, 278; 4 Otto, 107, 205; 2 Otto, 484, 494, 631, 637; 2 Woods, C. C. 523; 76 N. Car. 489; 13 Blatchf. 245; *Knox Co. v. Aspinwall*, 21 How. 544; *Goodman v. Simonds*, 20 How. 365; *Grand Chute v. Winegar*, 15 Wallace, 371; *Woods v. Lawrence Co.*, 1 Black, 386; *Mercer Co. v. Hackett*, 1 Wallace, 83; *Moran v. Miami*, 2 Black, 724; *Supervisors v. Schenck*, 5 Wallace, 784; *Bissell v. Jeffersonville*, 24 How. 299;

[The State, ex rel. Plock & Co. v. Cobb.]

6 E. & B. 327; 4 K. & J. 549; *Mon. Nat. Bank v. Globe Works*, 101 Mass. 57; 32 Barb. 527; 7 Wallace, 413; Green's Brice's Ultra Vires, 162.

BRICKELL, C. J.—It is a question not free from difficulty, and embarrassed by a conflict of authority, whether the governor, the head of the executive department of the government of the State, can be controlled by the judicial department, in the performance of duties devolved on him in his official capacity. The government of the State is divided into three distinct and independent departments, and the powers of each " confided to a separate body of magistracy;" and it is declared that " no person, or collection of persons, being of one of those departments, shall exercise any power properly belonging to either of the others," except in the instances expressly directed or permitted by the constitution.—Const., Art. 3. In *Tennessee & Coosa Railroad Company v. Moore*, 36 Ala. 371, this court decided, that when, from the nature of the authority conferred on the governor, he was clothed with a discretion in its exercise, the courts were without jurisdiction to control or direct him; yet, in reference to mere ministerial duties imposed upon him by statute, which might have been devolved on another officer, if the legislature had seen fit, and on the performance of which some specific private right depends, he may be made amenable to the compulsory process of the proper court by *mandamus*. Whether this case falls within the principle thus announced, or whether the principle itself is sound, and can be safely acted on, are questions which have not been argued by counsel, and in reference to which we express no opinion. The present controversy, it is apparent, is wholly between the holders of bonds of the Alabama & Chattanooga Railroad Company, indorsed by the State, of differing numbers; and has been in fact conducted by them, the governor being a nominal party, with the sole purpose of ascertaining judicially their rights in the distribution of the new bonds of the State, the governor was authorized to issue to extinguish the liability of the State upon its indorsements. To this question we confine our decision, that litigation may not be protracted, and doubt continue, embarrassing a settlement of the public debt, which a plain legislative policy for several years past has intended to expedite.

The proposition of the relators is, that the authority of the governor to indorse, in the name of the State, the bonds of the Alabama and Chattanooga Railroad Company, was a *special, statutory power*, exhausted when bonds to the amount of sixteen thousand dollars per mile, of the length of the road,

had been indorsed; that any subsequent indorsement of bonds was unauthorized—was not *in pursuance of, and in accordance with the terms, requirements and conditions,* of the statutes referred to in the tenth section of the act of February 23, 1876; and that such bonds are not, of consequence, to be retired, exchanged, and extinguished, by the use and application of the new bonds of the State. Whether this proposition can be maintained, depends on the interpretation and construction of the act last referred to, when it is taken in connection with the several statutes to which it refers, and the report of the commissioners on which it is based, and to which it was intended to conform, ratifying and approving their action.

The State proposing an adjustment of its liabilities, and of claims and demands against it, the power of the General Assembly to declare that only particular liabilities, or special claims and demands, should be adjusted, was undoubted. Its power, in this respect, was no less, and was of the same nature as, the power of an individual debtor, to provide for the adjustment, security, or payment of particular debts, omitting others, though they may be of greater, or less, or of equal obligation. The State could not, as the individual debtor could not, by any act of its own, by any expression of the legislative will, by any agency it could employ, lessen, or change, or impair, or destroy the obligation of contracts into which it had entered.—*Fletcher v. Peck,* 6 Cranch, 87. The power it could rightfully exercise, was, if it deemed it right and proper, to adjust particular liabilities, on particular terms, with the creditors accepting the adjustment; and if the adjustment was limited to particular liabilities, creditors holding other claims could not participate in its benefits. The State had indorsed the bonds of other railroad companies than the Alabama and Chattanooga Railroad Company; but no adjustment of such liabilities was proposed by the sections of the act of February 23, 1876, under consideration, and no part of the bonds of the State authorized by these sections could be employed in the extinguishment of such liabilities. The adjustment proposed is of liability on bonds of the Alabama and Chattanooga Railroad Company, bearing date in 1869; and it could not be extended to such bonds, if there had been any, bearing date in any other year. To all bonds of that company, bearing date in that year, indorsed in the name of the State, "*in pursuance of the terms, requirements and conditions of the several statutes referred to,*" the adjustment extends; and to the retirement, exchange and extinguishment of all such bonds, it is the duty of the governor to apply the new bonds of the State.

[The State, ex rel. Plock & Co. v. Cobb.]

What are the *terms, requirements and conditions of these statutes*, upon which the authority of the governor to indorse the bonds of the Alabama and Chattanooga Railroad Company depended? The governor is without general authority to contract in the name of, and bind the State. Whenever he so contracts, the power must be conferred by law, or the contract is without validity as to the State; and when the power is conferred on him to enter into particular contracts, binding the State, in reference to all and each of such contracts, the power may be denominated as *special*, to distinguish it from the *general* power an individual may confer on an agent to take charge of, manage and control his affairs, entering into contracts relating thereto. The exercise of the power may depend upon the happening of contingencies, or of future events, or upon the doing of particular acts by others; and if these contingencies or events do not occur, or these acts are not done, the power may not be vitalized, and its exercise as to the State of no validity. The ascertainment of the fact whether these contingencies or events have happened, or these acts have been done, may be committed to the discretion of the governor; and if with good faith, and reasonable diligence, he determines that they have occurred, or have been done, the exercise of the power will be valid, binding the State, as to all dealing fairly in reliance on the power, though it should be subsequently ascertained that the governor was mistaken, or misled and deceived. Or, on proof in a mode prescribed by the statute conferring the power, the governor may be required to exercise it; if proof in the mode prescribed is made, the power will be legally exercised, and the State bound to all who in good faith rely upon it, though the proof may have been false, corruptly and intentionally, by those making it. Any person contracting in the name of another, without authority, or an agent exceeding his authority, incurs liability to those dealing with him, though the principal may not be bound. In no one of the instances we have stated, would the governor incur liability, either to the State, or to the persons dealing with him; and in no one of them could it be said the power was not exercised in conformity to the statute conferring it.

The act of November 17, 1868, relating to the Wills Valley Railroad Company, and the North-east and South-west Alabama Railroad Company, made it the duty of the governor to indorse the bonds of the company owning the franchises of the North-east and South-west Railroad Company, whenever it should appear to him, by *satisfactory proof*, that particular sections of the road had been finished, completed and equipped. The act of February 19, 1867, required him to

indorse, on the affidavits of the president and chief engineer of a railroad company, and a resolution of its board of directors, showing and promising compliance with the conditions of the act. Now, if satisfactory proof was made to the governor, when the bonds were indorsed, that the road had been completed and equipped to a certain number of miles; if that proof consisted of the affidavit of the president, and of the chief engineer of the company; if it was accompanied by the affidavit of the president, and the resolution of the board of directory, that the bonds, when indorsed, should not be used otherwise than in the construction and equipment of the road, nor sold or disposed of for less than ninety cents on the dollar, can it be said the bonds, if in form and substance corresponding to the fourth section of the act of February 19, 1867, as do all these bonds, were not *issued and indorsed in pursuance of, and in accordance with the terms, requirements, and conditions of the several statutes*, which not only conferred authority, but made it the duty of the governor to indorse them in the name of the State? Without a dereliction of duty—without a disobedience to the legislative will—in the absence of any fact tending to arouse suspicion that the proof before him was untrue, could the governor have withheld the indorsement? It may be the proof was false, and that he was deceived as to the length of the road; and the falsity and deception may be easily exposed, when controversies arise between individual suitors in litigation before judicial tribunals; but it remains the proof on which the governor was required to exercise the power conferred on him, and on which he could not, without some good reason for suspecting its falsity, have abstained from acting.

The relation does not deny that, when the governor made the indorsements on the bonds, he had satisfactory proof that the number of miles of road finished and equipped entitled the company to an indorsement of each and all the bonds. It does not aver that any proof was before the governor, when the bonds the relators hold were indorsed, other than that before him when the bonds exceeding in number forty-seven hundred and twenty were indorsed. It does not aver the bonds were numbered, when presented to the governor for indorsement, or were indorsed in the order of their number; nor does it aver that the proof before the governor showed that the road did not exceed two hundred and ninety-five miles in length. The averment is, that as two hundred and ninety-five miles is the actual length of the road, the indorsement of bonds for a greater number of miles was not

[The State, ex rel. Plock & Co. v. Cobb.]

in pursuance of the statutes referred to in the 10th section of the act under consideration.

It is certainly true, that these statutes contemplate the State's indorsement of bonds of railroad companies, only to the amount of sixteen thousand dollars per mile of the road completed and equipped; and an indorsement for a road not completed and equipped would be in contravention of their purposes, and would impose no liability on the State, so long as the bonds had not passed to a *bona fide* holder. The excess of indorsement may be great or small; and the indorsement may have been obtained from mere error or mistake, innocently, or may have been obtained fraudulently; in either event, it would not involve the State in liability, until a *bona fide* holder had acquired the bond. But it is apparent that conformity of amount to the exact length of the road is not a *term, condition,* or *requirement,* on which the power and duty of the governor to make the indorsement depended. The affidavits of the president and chief engineer, as to the number of miles of road completed and equipped, was the evidence on which the governor was required to act, and on which he was bound to act, in the absence of all good reason to believe they were untrue. When he acts upon them, indorsing in the name of the State bonds of the company issued in conformity to the statute, the indorsement is *in pursuance of, and in accordance with the terms, requirements, and conditions* of the several statutes, which authorized him, by indorsing the bond, to bind the State.

That the indorsement might possibly be obtained fraudulently, or obtained, without fraud, in violation of the provisions of the statutes; or that, when indorsed, the bonds might be sold or disposed of for less than ninety cents on the dollar, was apprehended by the General Assembly, and provision made for the protection of the State in either event. Then, the attorney-general, on being notified by the governor, was required to institute suit against the railroad company; and on proof of the facts, a decree of sale of the road was to follow, and the proceeds of sale were to be paid into the State treasury, to form a fund for the payment of the bonds indorsed by the governor—as well those on which the indorsement was improperly, as those on which it was properly obtained. All are assumed to have been indorsed in accordance with the terms, conditions, and requirements of the statutes; the proper proof having been made at the time of the indorsement, though the proof was untrue in point of fact. We can not, therefore, adopt the proposition of the relator, that the power of the governor to indorse bonds depended on the actual length of the road, and that the

indorsement of the bonds in excess of the length was necessarily without authority and void. The power depended upon the proof before the governor, at the time of the indorsement, as to the number of miles of road completed and equipped; that proof being made, though untrue, the power was legally and properly exercised.

The State has capacity to enter into contracts, incurring liability absolute or contingent, as a principal debtor or as indorser, guarantor, or surety, when appropriate to the just exercise of its powers, save so far as capacity may be restrained by constitutional limitation. When it enters into contracts, while it obtains all the rights, it incurs all the responsibilities of individuals, who are parties to like contracts.— *United States v. Bank of Metropolis*, 15.Pet. 342. Its contracts are of the same obligation, of the same incidents, measured and governed by the same principles of law, as are the contracts of individuals. The contract may be of the class known as negotiable, or commercial paper; and the State may be the drawer, acceptor, indorser, or guarantor of such paper. If such is the character of the contract, the State is bound in the relation it assumes.

The contract is negotiable, and the promise of the State is not only to the immediate payee, or the present holder, but to whoever becomes the holder in the usual course of trade. The bonds indorsed by the State, being made payable in Boston, where, as we must presume, the commercial law is unaffected by legislation (whatever would have been their character, if payable here), are negotiable instruments, capable of transfer by delivery; and the State, as indorser, became liable to the holder at the time of the maturity of the bond, as it became liable for the interest coupons as they matured, if the maker of the bond made default. The very object and purpose of the indorsement of the State was to improve the credit, and to facilitate the currency of the bonds. Upon the governor, at the time of indorsing, the statutes devolved the authority and duty of ascertaining whether the facts existed which required him to make the indorsement, binding the State. The indorsement on each of the bonds, of whatever number, recites on its face that the Alabama and Chattanooga Railroad Company had "*complied with the conditions upon which the undersigned, governor of the State of Alabama, is required on the part of the State to give such indorsement*," and further recites, that it is made in pursuance of the acts of the General Assembly (referring to them by their respective titles) approved February 19th, 1867, September 22d, 1868, November 17th, 1868.

When the act of February 23, 1876, was passed, prior to and at the time of the report of the commissioners, all these bonds, bearing this indorsement, were in the commercial markets, the subject of sale, barter, or exchange, capable of transfer by delivery; and there could be no distinguishing between such as were indorsed for the exact length of the road, and such as may have been in excess of it. The numbers on the bonds would not indicate when they were issued, or when indorsed; certainly not when negotiated by the railroad company. Until such negotiation, the indorsement of the State was without obligation. So long as the bonds remained in the possession of the railroad company, they were not debts, nor evidences of debt, binding the company; nor did the indorsement involve the State in liability to the company. The company was the principal debtor; the State its surety or indorser, whom the company was bound to indemnify and protect. As the bonds were negotiated by the company, the indorsement of the State became of obligation. If the State was liable only to an amount of the bonds equivalent to sixteen thousand dollars per mile for the exact length of the road, the liability would accrue in the order of negotiation of the bonds, and the number on the bonds would afford no indication of the time and order of negotiation: the bond numbered fifty-three hundred may have as well been first negotiated as the bond numbered one, the bonds and indorsements all having the same date. The statutes, unlike the act of February 23, 1876, did not require that the bonds should be numbered; and such a requisition, if not impracticable, would not have been of value in giving notice to those dealing in them. The amount of a bond was not prescribed, but it was committed to the mere will of the railroad company to fix the amount, as an individual may fix the amount for which he will make a promissory note, or draw a bill of exchange; and certainly his numbering of either would be immaterial, not affecting its tenor and effect, putting no party on inquiry, and affording no notice of the consideration, or of any infirmity attending it.

An error which seems to underlie the whole theory of the contention of the relators, and of the argument supporting it, is the importance attached to the numbers of the bonds. These numbers seem to be supposed integral parts of the bonds, affording unmistakable evidence of the time and order of issue, indorsement, and negotiation. Yet, there can be no question that the number was not a part of the bond, or, if a part, it was immaterial. The number could have been altered, without affecting the liability of the maker

or indorser; and in pleading the bond or indorsement, whether the pleading was civil or criminal, the number would not so enter into its description or identification, that it must be averred. The contract of the parties, despite such alteration, would remain unaltered in its entirety. The amount of the bond, the time and place of its payment, the rate of interest it bears, and every essential of its terms and obligation, would remain unchanged, as would all the terms of the indorsement. The change or mutilation of the number would be a mere change or mutilation of a mark, placed upon the bond, it may be, by the maker, or the indorser, or it may be, by any holder, for the convenience and protection of the one or the other.—*Com. v. Emig. Ind. Sav. Bank*, 98 Mass. 12; *Birdsall v. Russell*, 29 N. Y. 220; *City of Elizabeth v. Force*, 29 N. J. Eq. 587; *Spooner v. Holmes*, 102 Mass. 503.

The bonds having been issued and indorsed, in circulation as negotiable paper, those who acquired them were bound only to inquire whether there was authority of law for their issue and indorsement. Irregularity, fraud, or misconduct may have intervened; misrepresentations may have been made to the governor, by which a larger amount of indorsements were obtained than the company was entitled to receive; these could not affect the title of an innocent holder, or, as against him, be made the subject of inquiry. On the governor was devolved the duty of making the indorsements, when satisfactory proof was made that the company was entitled to it, for a number of miles of road completed and equipped; and his certificate, in the indorsement, that the company had complied with the conditions of the statutes, was sufficient evidence to all *bona fide* holders, and conclusive in their favor against the State. The dishonor of the unpaid coupons for interest did not infect with dishonor the bond or other coupons, putting on inquiry those who in the usual course of trade, in good faith, and upon a valuable consideration, should acquire them.—Jones on Railroad Securities, §§ 287–295; 2 Dan. Neg. Ins. §§ 1537–1544.

It is to be presumed the General Assembly, in the enactment of the statute under consideration, was not unmindful of these propositions, established by a long line of decision in the Federal Supreme Court; and was not unmindful of the legal attitude in which the State was placed by the indorsements. Whether the then holders of the bonds were *bona fide* holders, who could not claim protection against any defenses the State could urge, was of but little importance. The bonds were commercial, and at any time could have been passed to innocent holders, against whom the defenses could not be made available. The defenses now

[The State, ex rel. Plock & Co. v. Cobb.]

insisted on, as rendering some of the indorsements void of obligation, could in no event be made available against any other of the indorsements, than such as were negotiated after there had been a negotiation of the full amount to which the company was entitled. It must, therefore, have been apparent to the General Assembly, that it was impossible to distinguish which of the indorsements, if any, could be repudiated as excessive, and which were of undoubted obligation. The exclusion by the governor in 1871, in the payment of interest, of all beyond the number of forty-seven hundred and twenty, was not conclusive; and could not, indeed, operate as evidence for the State as against theholders of the bonds bearing a higher number. It may have been the act of the State, but it was strictly *ex parte*—the act only of one party, and the party to be charged, not affecting the other party, the holder of the bonds.

It is in view of these principles of law, which fix the legal attitude of the State, that the statute under consideration must be read and interpreted, when taken in consideration with the report of the commissioners, whose action and plan or scheme of adjustment it ratifies and confirms. A patent object of the act, expressed in the preamble, is the adjustment of claims *alleged against the State*, by reason of the indorsements of the bonds of the Alabama and Chattanooga Railroad Company, *so that no question of dispute* would thereafter exist between the State and the holders of such bonds. Such questions would exist, if the theory of the relators prevailed, and five hundred and eighty thousand dollars of these bonds were left unretired and unextinguished. It is not of importance that the State can not be sued, and could not, by any other legal remedy than petition to the General Assembly, be required to satisfy its liabilities. The statute was not enacted with a view to the freedom of the State from being pursued, as an individual may be, by legal remedies in judicial tribunals; but with a view to an adjustment, corresponding to its ability to pay, of all the indorsements of the bonds of this company, preferred as claims against it. Nor did the General Assembly intend to assume to determine that some of the claims were of legal obligation, and others were not. That was a question upon which the holders of the claims must be heard, and which could only be determined by future *dispute*, the statute intended to avoid. All these indorsements are, in the statute, designated as *alleged claims;* and there seems to have been a careful avoidance of making any distinction between them.

The commissioners report, as contingent liabilities of the

State, the indorsements of the bonds of the Alabama and Chattanooga Railroad Company, *four millions seven hundred and twenty thousand dollars ; and over issue, five hundred and eighty thousand dollars.* The plan, or scheme, of adjustment of the liability of the State they propose, is that embodied in the act under consideration ; and as they report, it is *in full satisfaction of all liability on account of indorsements for that company.* They make no distinction, and could make none, between the indorsements, though it was then a well-known fact, recognized in the report, that the indorsements exceeded, by five hundred and eighty thousand dollars, the length of the road, finished, completed and equipped. It is this adjustment of liabilities, growing out of the indorsements of these bonds, the preamble of the act recites the State may wisely accept. The legislative intention, that the new bonds of the State should be employed in full payment and discharge of all claim, demand or liability, *for or on account of any indorsement by any officer or agent of the State, or any person acting in its name, on or upon any, every and all bonds made or issued by the said Alabama and Chattanooga Railroad Company, bearing the indorsement thereon of this State, or in its name,* is too clearly expressed in the 12th section of the act, to leave any room for doubt or construction, if the words of the 10th section, so much relied on, were of doubtful import.

We are of the opinion, that the new bonds of the State must, without inquiry as to the number on the bonds of the Alabama and Chattanooga Railroad Company, or as to whether there was or not an excessive indorsement of such bonds, be applied in exchange, retirement and extinguishment of all such bonds bearing the indorsement of the State.

This conclusion compels an affirmance of the judgment of the City Court.

MANNING, J.—The petition for a *mandamus* in this cause, as I understand the matter, was filed to obtain a judgment declaring it the duty of the governor, under the acts of the legislature concerning the settlement of the railroad debts of the State, to distribute and deliver the bonds for the amount of one million of dollars, with which it proposed to discharge itself of liability for its indorsements of bonds of the Alabama and Chattanooga Railroad Company, to and among the holders of, and in exchange for, those only of said bonds which are numbered respectively from one to 4,720, both inclusive ; upon the ground that, under the law, the railroad company was entitled to ask for the State's indorse-

[The State, ex rel. Plock & Co. v. Cobb.]

ment for no more than the $4,720,000, for which those bonds were given; that being the amount produced by $16,000 multiplied by the entire number of miles of the company's railroad. All the bonds bearing numbers above 4,720, the petitioners insist, should be regarded as having been repudiated by the State, for the fraud by which the indorsement of them in its name had been obtained.

The question involved was very ably and elaborately argued. But we all agree in the conclusion, for reasons set forth in the opinion of the Chief-Justice, that no distinction can be made, in respect of their validity, between the bonds bearing the indorsement of the State, merely for the reason that some are numbered over, and some under 4,720. We hold, that the indorsement of the State must, for the purpose of this settlement, be held to have been as validly made on those over, as on those under the number specified.

There is no other question, it seems to me, which, upon this petition, and between these parties, we are entitled to decide,—except one, which it is now not necessary to consider; and that is, whether, if we concurred in the views of counsel for petitioners on other matters, we would have authority to coerce the governor by writ of *mandamus*, or otherwise, to distribute and deliver the new bonds according to the prayer of the petitioners.

I concur in the opinion that the judgment appealed from should be affirmed.

STONE, J.—I fully concur in the conclusion, that *bona fide* holders of the bonds indorsed by the State in excess of the proper amount, have the same legal and equitable right to share in the million of bonds issued for the purpose of liquidation, as the holders of the indorsed bonds that were not in excess. I hold, that purchasers of such bonds need only look to the indorsements and their recitals, and to the statutes under which they were indorsed. They were not expected to know the length of the road, nor the progress or extent of its completion. The ascertainment of these facts is, by the statutes, confided to the governor; and the certificate by him, embodied in the indorsement, that the requisite proof had been made, is the only evidence a *bona fide* purchaser need make of the due completion of the road, authorizing the indorsement. I think, also, that no importance is to be attached to the numbers on the bonds. On these questions, I fully concur with the Chief-Justice.

I think the present relators failed to make a case authorizing *mandamus*, for the following reasons. *First:* I do not

(11)

[Dunklin v. Wilson.]

think the legislature intended to cast on the governor, or on the State, the imperative duty of conducting litigation, or incurring expense, in determining who are, and who are not, *bona fide* holders of such indorsed bonds. *Second:* The relators in the present case do not aver, nor show, that they are *bona fide* holders of the bonds described in their petition, and they thus fail to show they have a clear legal right to the remedy they invoke. *Third:* I concur with Judge MANNING that, in this form of proceeding, in which only Plock & Co. and the governor are parties to the record, the claims of other bondholders, not parties to this suit, can not be pronounced upon.

My individual opinion, however, is, that only *bona fide* holders of the bonds indorsed for the Alabama and Chattanooga Railroad Company, have any right to share in the million of new issue. I intimate no opinion as to how the conflicting claims of the several bondholders are to be adjusted.