CASE 68—FEBRUARY 27.

# Greenwell v. Haydon.

APPEAL FROM NELSON CIRCUIT COURT.

1. The general rule is, that the owner of property cannot be divested of his title, except by his consent, either express or implied. To that rule there are some exceptions, one of which applies to negotiable securities.

2. If such paper, payable to bearer, or indorsed in blank, be lost or stolen, and be passed in the ordinary course of business, before maturity, into the hands of an innocent holder for value and without notice, such holder obtains title to it with the right to enforce payment as though he had received it from the person who lost it, or from whom it was stolen.

3. But if the negotiable paper be taken *after* maturity, it is taken subject to all the equities and defenses that might have been made against it in the hands of the person from whom the taker received it, and the real owner from whom it is taken, without his consent, may recover it.

Greenwell v. Haydon.

WM. JOHNSON FOR APPELLANT.

1. It is clearly shown that the bond in controversy was taken from appellant without his consent. The allegations of appellee's petition are fatal to his demand.

2. The bond had been past due for several years, and was not passed to appellee in discharge of a pre-existing debt. (May v. Quimbey, 3 Bush, 96; Lee v. Smead, 1 Met., 634; Alexander v. Springfield Bank, 2 Met., 535.)

MUIR & WICKLIFFE FOR APPELLEE.

1. The fact that the paper was overdue does not affect appellee's right to enforce his lien upon it.

2. A *bona fide* purchaser for value of a negotiable bond may hold it against the true owner. Any person in possession may fill up the blank and sue upon it. (Session Acts 1855-'6, 12; 7 Wallace, 700; 10 Ibid, 127; 10 Ibid, 68; Ibid, 90; 16 Ibid, 402; 20 Ibid, 72; Gen. Stat., chap. 22, sec. 6; 1 Dow., 50; 2 Johnson's Chy., 443; 3 B. Mon., 446; 5 Litt., 33; 9 Dana, 416; 16 B. Mon., 575; 5 Ibid, 400; 2 Wash., 233; 2 Met., 537; 2 Howard, 371; 21 Wendell, 551; 6 Wheaton, 220; 3 Saund., 222; 4 Duer, 362; Daniel on Negotiable Instruments, vol. 2, 459; Ibid, 1, 627; 2 Wallace, 110; 4 Dolphus & E., 870; 22 How., 96; 38 N. J., 146; 20 Am. Rep., 379; 47 N. Y., 143; 7 Am. R., 423; J. John., 264; 1 Term Rep., 16; 10 Cushing, 373; 22 Eng. Law and Eq., 516; 10 John. Rep., 104; 5 Ibid, 239; 5 John. Chy. Rep., 54; 6 Ohio, 448; 1 Am. Law Reg., 75.)

JUDGE COFER DELIVERED THE OPINION OF THE COURT.

Pursuant to proper legislative authority, the county court of Nelson county, on the 31st of August, 1856, issued coupon bonds to the amount of one hundred thousand dollars, for and on behalf of the first, fifth, and ninth election precincts in said county, payable January 1, 1872, to the order of the president of the Bardstown and Louisville Railroad Company.

The appellant was the owner of one of these bonds (numbered 13) for one thousand dollars, indorsed in blank by the president of the railroad company, which he deposited with E. B. Smith for safe-keeping. J. L. Spalding borrowed one thousand dollars from the appellee in 1871, and pledged another bond of the same series and for like amount as col-

lateral security. The appellee deposited Spalding's note and the bond pledged to secure it with a firm of private bankers for safe-keeping. Spalding having obtained possession of appellant's bond, without the knowledge of Smith or the appellant, took it to the bank where his note and bond were on deposit, and procured the bankers to receive appellant's bond in exchange for the bond pledged at the time of executing the note. This was in July or August, 1877, more than five years after the maturity of the bonds.

On account of a deficiency of funds provided by law for paying the bonds, the county was unable to pay them all at maturity; but the interest was regularly paid, and the bonds were passed from hand to hand with the blank indorsement of the president of the railroad company upon them.

The sole question in this case is, whether the appellee has a lien on bond number 13 superior to the title of the appellant.

Bonds similar to this have generally, if not universally, been recognized and treated by the courts of this country as commercial paper, and the rights of holders thereof are regulated and protected by the law-merchant.. (White v. Verm. and Mass. R. R. Co., 21 How., 575; Merarlo v. Hackett, 1 Wall., 83; Gilpike v. City of Dubuque, Ib., 175; Myer v. City of Muscatine, Ib., 384; Murray v. Lardner, 2 Wall., 110; Thompson v. Lee County, 3 Wall., 327; Supervisors v. Schenk, 5 Wall., 772; Arents v. Commonwealth, 18 Gratt., 750; Beaver County v. Armstrong, 44 Penn., 63.)

The propriety of this rule is not questioned in this case, and we shall proceed as if the bonds of which this is one were expressly declared by statute to be negotiable.

It is contended by the appellant that, having received the bond as collateral security for a pre-existing debt, the appellee is not a holder for value.

The holder of commercial paper, who receives it only as collateral security for an antecedent debt, and who comes under no legal obligation to forego the pursuit of any existing remedy, and who has not in any form given a new or additional consideration for the collateral, is not a holder for value, and the title thus acquired is subordinate to that of the true owner. (Lee v. Smead, 1 Met., 634.)

But the holder of such paper, who receives it in discharge of an antecedent debt, and thereby suspends his right of action against his debtor upon the original demand, without notice of a defect in the title of the person from whom he receives it, has a right to hold it against the real owner, though the person from whom he received it had no title. (Alexander v. Springfield Bank, 2 Met., 534.)

The appellee held as collateral security a bond owned by Spalding, and surrendered that bond in exchange for the bond here in contest. This was a legal consideration for the pledging of this bond, and the appellee must therefore be held to be a holder for value.

It is next contended, that although he may be a holder for value, yet, as Spalding had no title, and the bond, when pledged, was long past due, he is not a *bona fide* holder within the meaning of the law-merchant, and has no better title than Spalding had.

It is so well settled as to have become one of the fundamentals of commercial law, that commercial paper in the hands of one who receives it after maturity is subject to all the equities between the parties to which it would have been

subject in the hands of the person from whom the holder received it, whether he had notice of such equities or not.

Whether this includes all equities and demands between the parties, or is restricted to such as attach to the paper itself, such as illegality or want of consideration, payment, fraud, or the like, it is not necessary now to inquire.

It is equally well settled that the holder of such paper who takes it under due for a valuable consideration, and without notice of equities or defenses against it in the hands of the person from whom he receives it, takes it freed from such equities and defenses, and may enforce payment, although the person from whom he receives it could not.

These rules relate to the right of the holder growing out of his ownership of the paper, and not to his title to the paper itself. In either case he acquires a valid title to the obligation, and is entitled to recover on it in the one case whatever is justly due from the parties to the paper, and in the other whatever the paper calls for, whether it is justly due from the parties or not.

In cases belonging to either of these classes no question arises as to the title of the holder. He is conceded to be the owner of the obligation. The question is, what is the extent of his right of recovery? If he took it overdue, he cannot recover, unless the person from whom he received it could have recovered, and if that person could only have recovered a part, he can recover no more; if that person could have recovered all, he may recover all, for he stands in that person's place.

There is another class of cases in which the title to the obligation was involved. The case at bar belongs to that class. There is no question here between the holder and the maker. It is a question as to the right to receive what-

Greenwell v. Haydon.

ever sum the maker may owe, and not as to whether the maker shall pay his obligation in whole or in part.

This distinction seems not to have been always kept in view, and, as a natural result, the authorities are in some confusion, decisions in one class of cases being often quoted in the discussion of cases belonging to another class.

With this distinction in mind, we proceed to the consideration of the question involved in this case—the conflicting claims of the parties to ownership of the bond.

Down v. Halling (10 E. C. L., 347) was a contest between the owner of a lost check and one who, five days after it should have been presented for payment, received it from the finder for value, and without notice of any defect in the title.

The holder presented the check and received payment, and the owner sued him to recover the amount as money had and received to the use of the plaintiff.

The case was tried before Lord Chief Justice Abbott, who directed the jury to find for the plaintiff if they thought that the defendant had taken the check under circumstances which ought to have excited the suspicions of a prudent man.

The jury found for the plaintiff, and, on a rule to show cause, a new trial was denied.

Bayley, J., said: "I think the case was left to the jury very favorably for the defendant. There is no question whatever in the case, if the distinction between bills overdue and not due be adverted to. If a bill, note, or check be taken after it is due, the party taking it can have no better title to it than the party from whom he takes it, and therefore cannot recover upon it if it turns out that it has been previously lost or stolen."

Holroyd, J., said: "In many of the cases where the title to stolen bills or notes has come in question, they have been taken before they were due, and then it may have been a proper question to submit to the jury whether they were taken *mala fide* or *bona fide*. A check is payable immediately, and the holder of it keeps it at his peril, and a person taking it after it is due takes it at his peril. . . . . I think, when the defendants took the check, more than a reasonable time for presenting it for payment had elapsed, and therefore they took it at their peril."

The case stood over under advisement for several days, when Abbott, C. J., delivered the judgment of the court. He said: "It further appears that the check came into the hands of the defendants five days after its date. We are all of the opinion that an instrument of this nature, coming to the hands of a party so long after its date, is to be considered in the light of a bill of exchange overdue; and, in such a case, it is incumbent on the party who takes the instrument under such circumstances to show that the party from whom he took it had a good title to it."

Ashurst v. The Official Managers of the Royal Bank of Australia (37 English Common Law and Equity Reports, 195) was an action on a promissory note. The note was held by one Boyd, who became bankrupt, and afterward assigned it, overdue, to the plaintiff. The sole question involved was, whether the plaintiff or the assignees of the bankrupt had the better title. The Court of Queen's Bench decided in favor of the latter.

Lord Campbell said: "If the note had been transferred by an uncertificated bankrupt before it was due, the bearer for value would have had a right to sue upon it, but the

Greenwell v. Haydon.

transfer, being after it was due, he has no such right, because the transferee can take no better title than the transferrer had." He said the bankruptcy of Boyd went to his very title, "and the plaintiff had no better title than if he had taken it from a person who had stolen it."

Crompton, J., although maintaining that a negotiable instrument continued to be negotiable to a certain extent after maturity, said: "But the question of negotiability is different from the question of title. As to that, the party taking the instrument during the currency of it, may acquire a better title than the transferrer had, but when it is overdue it comes disgraced into the hands of the transferee, and that principle does not apply."

These are the only English cases that are directly in point that we have been able to find.

There are many cases, both English and American, in which it has been held that a negotiable instrument, passed by indorsement or by delivery after its maturity, is subject, in the hands of the indorsee, to all the equities and defenses to which it would have been subject in the hands of the indorser. But such questions have generally arisen between the holder and the maker or other party to the paper, and, as already remarked, those cases have no application here.

We have already quoted the only English cases we have been able to find which are in point. The only American cases we have found are Arents v. Commonwealth (18 Gratt., 750) and the separate opinion of Mr. Justice Swayne in National Bank of Washington v. Texas (20 Wall., 72).

The former of these cases is imperfectly reported, but seems to have been decided upon the ground that the plaintiff had no title to the negotiables in controversy in the case.

The case was this: The city of Wheeling issued certain coupon bonds, and the state of Virginia guaranteed the payment of the bonds and coupons.

A number of the coupons were stolen from the office of the Second Auditor of the State, and were purchased by Arents overdue, *bona fide*, and without notice that they had been stolen.

Suit was brought against the state to recover the amount of the coupons. Recovery was resisted upon several grounds, but the court decided against the plaintiff on the ground that the coupons, having been stolen, the plaintiff had no title.

Jaynes, J., in delivering the opinion of the majority of the court, said:

"It is contended, on the other hand, that the coupons. were overdue when the plaintiff received them, and that the fact of their having been stolen is fatal to his (plaintiff's) claim. The point of the objection as to the theft is simply that the coupons *had been stolen*, not that they had been stolen from the state. The objection to the plaintiff's title on this ground would be the same, no matter from whom. they were stolen."

The court then proceeds to say:

" No principle is better settled than that a party who takes a negotiable instrument by indorsement or delivery, after it has become due, gets no better title than the party had from. whom he received it," citing Ashurst v. Bank of Australia, *supra.*

And again, the court, after discussing the question at some length, said: "And it follows, from the principles above stated, that a person who takes a negotiable instrument after it has become due cannot recover upon it if it has been previously stolen, unless it was stolen before maturity, and.

Greenwell v. Haydon.

passed afterwards into the hands of a *bona fide* holder, from whom the plaintiff derived his title."

In Ashurst v. The Bank, and in Arents v. the Commonwealth, the question arose between the holder and a party to the paper. But it was not claimed in either that the defendant had any defense against the obligation itself. The defenses were based solely on the ground that the instruments having been transferred overdue, and the transferrer having no title, none passed to the transferee, who, being without title, could not recover, although the defendant had no defense against the obligation.

But the learned counsel for the appellee cite National Bank of Washington v. Texas (20 Wall., 72) as establishing a contrary doctrine.

That case related to certain bonds of the United States issued to the state of Texas, payable "to the state of Texas or bearer." For a full history of these bonds and the litigation concerning them, see Texas v. White, 7 Wall., 700; Texas v. Hardenburg, 10 Wall., 68; Texas v. Chiles, Ib., 127; Huntington v. Texas, 16 Wall., 402; and National Bank v. Texas, *supra*.

It will suffice for a proper understanding of so much of the opinion in the latter case as is relied upon in this to state the following facts:

In 1851 the government of the United States issued to the state of Texas its bonds of the denomination of one thousand dollars each, to the number of five thousand. The bonds were *redeemable* after December 31, 1864.

It was claimed by the state that a large number of these bonds had been illegally disposed of to White & Chiles in January, 1865, and the state filed its bill in the Supreme Court of the United States against the National Bank of

Washington and others for discovery and relief in regard to certain bonds claimed to be a part of those illegally disposed of to White & Chiles, and which, it was alleged, were in possession of the bank.

The bank admitted that it held certain of the bonds issued by the United States to the state of Texas, but denied that it held any of the bonds disposed of to White & Chiles, and also denied that any bonds were illegally disposed of to them.

It will be observed that if Texas failed to show that bonds were illegally disposed of to White & Chiles, and, in addition, that the bonds in the hands of the bank were a part of those so disposed of, it must necessarily fail to manifest a right to relief.

Mr. Justice Miller delivered the opinion of the court. He said:

"The main allegation in the bill is, that these are part of the bonds issued to White & Chiles, in aid of the rebellion. All knowledge of this fact is denied by the defendants, and the fact itself is denied. Conceding that their denial of the fact . . . . had no other effect than to put in issue the allegations of the plaintiff's bill on that subject, it remained for the plaintiff to establish its truth by evidence."

The court held there was not only no sufficient evidence, but that there was no evidence at all that any of the bonds were illegally disposed of, and, in addition, that it appeared that a large number of the same series of bonds had been lawfully disposed of, and that it did not appear that the bonds in contest were not a part of these bonds.

These conclusions were necessarily decisive of the case, and it was decided by the court on that ground.

Mr. Justice Swayne delivered a separate opinion in the case, and it is upon that that counsel rely.

That opinion goes very far to sustain the position contended for, but notwithstanding the admitted learning and ability of its author, we feel compelled to dissent from some of the views expressed by him as contrary to the weight of authority, including the opinion of the court in Texas v. White (7 Wall., 735). In that case the Chief Justice delivered the opinion of the court.

He referred to the case of Murray v. Lardner (2 Wall., 118), and said: "We held in that case that the purchaser of coupon bonds, before due, is unaffected by want of title in the seller, and that the burden of proof in respect of notice and want of good faith is on the claimant of the bonds as against the purchaser. . . . But these rules have never been applied to matured obligations. Purchasers of notes and bonds past due take nothing but the actual right and title of the vendors."

That case involved the question of the right of the state of Texas to sue in the Supreme Court. The majority of the court decided that the state had such right. Upon that point Mr. Justice Grier dissented, and Swayne and Miller, J. J., concurred with him, but expressed their concurrence with the majority of the court on the merits of the case, and Mr. Justice Grier did not express any dissent, except upon the question of jurisdiction.

We are therefore authorized to assume that the whole court concurred with Chief Justice Chase in holding that purchasers of overdue negotiables acquire no better *title* than the seller had.

It has been said that this point did not arise in that case, because the court held that the holders of the bonds took

them with notice of the illegal manner in which White & Chiles became possessed of them. But it is to be remarked that the court was not content to rest its judgment upon the question of fact, but saw proper to fortify what we may assume to have been a doubtful conclusion of fact by an expression of the opinion that if the fact respecting notice were otherwise, the judgment must still be for the plaintiff upon the law of the case, independent of that fact.

But if the opinion of the whole court in Texas v. Chiles upon this point must be rejected as *obiter*, then the doubt expressed in Bank v. Texas by the majority as to what was said on the point in Texas v. Chiles must be rejected on the same ground, thus leaving us without an authoritative deliverance by the Supreme Court on the subject; while all the authorities to which we have referred are against the conclusion of the separate opinion of Justice Swayne.

Murray v. Lylburn (2 Johns. Chy., 441) is referred to in the brief as sustaining the appellee's view of the law of this case.

A careful scrutiny of that case will show that the chose in action there in controversy was payable to Winter, who was trustee for the plaintiffs, and consequently that the plaintiffs had but an equity; and the chancellor refers to their claim as a mere *latent* equity, and cites Redfearn v. Ferrier (1 Dow, 50), in which the facts were these:

David Stewart, a merchant in Leith, was the ostensible owner of a share in the Edinburg Glass-house. The share was purchased for a firm of which David Stewart was a member, but a rule of the Glass-house Company required that shares should be only in the names of individuals, and hence the share stood in his name and not in the name of the firm. The partnership, as it existed when the share was

Greenwell v. Haydon.

purchased, was dissolved, and another formed, composed of David Stewart and Somervail. The share in question remained with the new firm, but continued to stand in the name of David Stewart. Stewart borrowed money of Redfearn, and, to secure it, assigned the share, and a contest arose between him and Somervail, who of course had only a *latent equity*.

Intimation (notice) of the assignment was duly given to the Glass-house Company by Redfearn, which, by the law of Scotland, completed the transaction and gave him a right to the share, good against even a prior assignment that had not been intimated.

Somervail's claim was no more than a secret equity between himself and Stewart, while the latter, with *his consent*, held the ostensible title, which enabled him to pass a legal right to his assignee.

That case has no application here. The appellant does not seek to enforce a mere latent equity against an assignment made by one who, with his knowledge and consent, held the legal title. He does not assert an equity at all, but the legal title, which he confessedly held, and with which he never consented to part, and which, as we shall hereafter see, no rule of law or principle of natural justice prevents him from insisting upon.

The general rule is, that the owner of property cannot be divested of his title otherwise than with his consent, either expressed or implied. To that rule there are some exceptions, one of which applies to negotiable securities. If such papers, payable to bearer or indorsed in blank, be lost or stolen, and be passed, in the ordinary course of business, before maturity, into the hands of an innocent holder for

value, and without notice of the fact that it has been so lost.
or stolen, such holder, though he take it from the finder or
the thief, gets title to the paper and a right to enforce pay-.
ment just as if he had received it directly from the person
who lost it or from whom it was stolen.

This, however, is a rule of public policy and not of natu-·
ral justice.   It is a rule adopted for the convenience and
security of commerce, and should not be extended beyond
the requirements of trade.   And in respect to negotiable·
paper, strictly so-called, such as bills, checks, and negotiable·
notes, it has been restricted to the time of maturity, so that
no one denies that the well-settled law is, that one who takes
such an instrument after maturity takes it subject to all the·
equities and defenses that might have been made against it
in the hands of the person from whom he received it.   This.
rule puts an end to the use of such paper for commercial
purposes after it becomes due, and there would seem to be
no reason why it should not be at once relegated in all
respects to the position it would have occupied if it had
never been elevated above the dignity of an ordinary chose
in action.

Without examining into the reasons upon which it has.
been held that coupon bonds, having a long time to run, are
to be treated as negotiable, or intimating an opinion as to
the correctness of that conclusion, it is sufficient for this case
to say that they have never, to our knowledge, been claimed
to be upon any higher plane of security than notes, bills, or·
checks, and that there cannot, in the very nature of the
case, be any reason for placing one who takes such bonds
when past due upon any more favorable ground than the:
taker of an overdue bill or note.

Greenwell v. Haydon.

It is because bills and notes cease, after maturity, to supply the place of money, that the interests of commerce are supposed not to demand their further protection.

Before maturity, coupon bonds are sought for as safe securities upon which to loan money; but when they mature they are not desirable as an investment, and they are not purchased for any such purpose. If purchased at all, it is upon speculation and out of the ordinary course of business, and there is no sufficient reason why they should be kept any longer under the protection of a rule against natural right, the reasons for which no longer exist.

Whoever takes a bill or negotiable note after maturity, takes it, so far as the title to, and integrity of, the paper is concerned, upon the credit of the person from whom he receives it. He gets whatever right and title that person had and no more, and the principle upon which that rule, as to bills and notes, is placed, applies with equal force to coupon bonds.

We are therefore of the opinion that the court erred in adjudging in favor of the appellee; and the judgment is reversed, and cause remanded for a judgment in conformity to this opinion.