# Citizens State Bank of Greenup, Kentucky v. Johnson County.

(Decided December 17, 1918.)

## Appeal from Johnson Circuit Court.

1. Bills and Notes—Infirmity in Negotiable Instrument—Notice.—To constitute notice of an infirmity in a negotiable instrument, or defect of title in the person negotiating it, the purchaser must have had actual knowledge of the infirmity, or defect, or knowledge of such facts that his action in taking it amounted to bad faith, and this was the common law rule before the enactment of our present Negotiable Instruments Act.

2. Bills and Notes—Purchaser of Paper.—In the absence of actual knowledge of such matters by the purchaser, his failure to act as an ordinarily prudent person would have done under the same circumstances is insufficient to make him a purchaser in bad faith, since he is not required to measure his caution by that standard in accepting the paper.

3. Bills and Notes—Evidence.—The evidence through which the purchaser's knowledge of such matters is obtained may be facts *aliunde* the paper or facts furnished by its face, and where there is no evidence of such facts *aliunde* the paper, and that furnished by its face is insufficient to establish the required knowledge on the part of the purchaser, it is the duty of the court to so instruct the jury.

4. Bills and Notes—Alteration.—An alteration to destroy the obligatory force of commercial paper must, among other things, be a material one, and neither an alteration of the number upon the paper, nor even a retracing of a name which was criginally legally subscribed thereto, especially in the absence of evidence showing such retracing of the name was done to restore it after an attempted cancellation or discharge of the paper, are material alterations.

ALLEN D. COLE, FOGG & KIRK and H. W. COLE for appellant.

VAUGHAN & HOWES for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

In 1891 the fiscal court of Johnson county, by an order duly made and entered upon its records, authorized the issual of ten (10) of the county's bonds for the sum of $500.00 each, aggregating $5,000.00, which was done for the purpose of raising funds to build a jail and jailer's residence. The bonds were duly issued, bearing six per cent. interest payable semi-annually, and were made payable to bearer and at the Second National

Bank in the city of Ashland, Kentucky. There were attached to the bonds coupons representing each semi-annual installments of interest for the period which the bonds were to run, which was twenty years from date. The bonds were signed by the county judge of the county and countersigned by its county court clerk, the coupons being signed by the latter official only.

This suit was filed by the appellant and plaintiff below, Citizens State Bank of Greenup, Kentucky, against the county to recover upon a bond which plaintiff alleges is one of the issue above referred to, and which it claimed to own under a *bona fide* purchase made in due course from the then holder in the early part of the year 1905.

The answer pleaded (1) a denial that plaintiff was a *bona fide* purchaser, or that it obtained the instrument sued on in due course. (2) *Non est factum.* (3) Payment and cancellation, and (4) that the bond sued on if duly executed was never issued, but after execution was canceled. Other defenses growing out of facts arising subsequent to the time plaintiff obtained the bond and which defendant insists rendered the plaintiff a purchaser with notice, if one at all, were relied on, but none of them is sustained by any testimony in the record. True it is that plaintiff made some contracts looking to a contemplated transfer of the bond, but according to the testimony none of them was ever completed so as to vest the attempted transferee with full and complete title. So that, according to our view, the case must be determined upon the theory that plaintiff at the time of the suit occupied the same status with reference to the paper that it did when it first acquired it. Appropriate pleadings made up the issues, and upon trial, under instructions from the court, the jury returned a verdict in favor of defendant, resulting in the dismissal of the petition. Complaining of that judgment, plaintiff prosecutes this appeal.

Perhaps it should have been said that the bonds provided for the county to have the right, after five years from date of their issual, to pay and discharge them, and the principal defense as argued by counsel is that this reserved right was exercised with reference to the bond sued on, if indeed it was ever put in circulation after being executed. And further, that if it was never put in circulation it was afterwards canceled, and that in

either event plaintiff's transferor obtained it fraudulently from the archives of the county, and in the same manner removed or erased from the face of the bond the evidence of cancellation which the county had put upon it, and with the bond in this condition transferred it to the plaintiff. The disposition of the question raised relative to the manner in which plaintiff acquired the bond will be deferred to a later part of this opinion, since we have concluded to consider first some other defenses made in the answer.

The defense of *non est factum,* which includes the one that the bond was forged, finds no support whatever by any testimony found in the record. On the contrary, it is conclusively shown that the bond sued on was duly subscribed by the proper officers of the county with the seal of the county thereto attached. This seems to be conceded by counsel representing the county, and these defenses will require from us no further consideration.

That all of the ten bonds directed to be and which were executed were also issued and put into circulation is equally established by the testimony, especially by that of John P. Wells, who is shown by an order of the fiscal court to have been employed for the express purpose of negotiating the bonds. He says in his testimony that all ten of them were given to him and that he sold them, but he does not give the names of the purchasers. So that this testimony at once silences the contention that the bond sued on, provided it was one of the ten, was not issued after being executed.

Another uncontradicted fact appearing in the record is that only nine of the ten jail bonds issued were ever taken up or paid by the county. On December 15, 1897, one Howes, the ex-sheriff of the county, produced numbers 6, 7 and 8 of the jail bonds as having been paid by him, and they were ordered canceled. On that same day the then sheriff of the county, Samuel Stapleton, produced numbers 3, 4 and 5 of the same issue, which he had paid; and they were likewise ordered canceled. On the next day, December 16, an order was made to cancel two of the jail bonds which the order recites had theretofore been paid by W. E. Litteral, county judge. There was also produced at the trial bond number 9, upon which was written in red ink these words: "Canceled by S. P. King, October 2, 1902, by J. M. Price, clerk, by C. Buckinham, D. C." There was never any

order made with reference to either the payment or the cancellation of the last mentioned bond. What we have just related is all the testimony shown either by the fiscal court record or by any testimony *aliunde* the record concerning the payment or cancellation of any of the ten jail bonds referred to. It would therefore appear that the pleas of payment and cancellation were each entirely unsupported by the testimony, unless the face of the bond itself and that of the coupons thereto attached furnish evidence af those two defenses, and this brings us to the chief contention in the case.

It is conceded, as indeed it would have to be, that the bond under the law as it then existed was a negotiable instrument and commercial paper, so as to protect *bona fide* holders in due course against latent defense. Its terms fully met all of the requirements of the law relating to such paper so as to make it a negotiable instrument, and it was made payable at a regularly incorporated bank in this state, which was a requirement of the law at that time, and plaintiff acquired it before its maturity. So that the first question under this head is, did plaintiff acquire the bond in due course and without notice so as to protect it against the defenses interposed?

Our present statute upon the subject (being subsection 56 of section 3720b of the Kentucky Statutes) defines the character of notice which would deprive the holder of such an instrument from being one in due course in this language: "To constitute notice of infirmity in the instrument, or defect in the title of the person negotiating the same, the person to whom it is negotiated must have had actual knowledge of the infirmity or defect, or knowledge of such facts as that his action in taking the instrument amounted to bad faith." But since our present statute was passed subsequent to the execution of the bond sued on, its provisions would not govern the rights of the parties, unless they coincided with and were declarative of the law upon the subject as theretofore existing.

In the English case of Gill v. Cubit, 3 B. & C. 446, decided in 1824, the doctrine was announced that if the holder acquired the paper under circumstances which should have excited the suspicions of a prudent man, he would be deprived of the benefits accruing to a holder in due course, although he may have given full

value for the paper. But the requirement that a purchaser should act with prudence was ten years later repudiated by the highest court of England in the case of Crook v. Jadis, 5 B. & Ad. 909, 27 E. C. L. 234, in which the rule was announced that the purchaser to be deprived of the rights of a *bona fide* holder must be guilty of gross negligence, and this rule has since been followed by the courts of England so far as we are advised. Lord Denman, who was the first English judge to repudiate the doctrine of the Cubit case, in the case of Goodman v. Harvey, 4 Ad. & El. 870, 31 E. C. L. 212, in speaking upon this point said: "I believe we are all of the opinion that gross negligence only would not be a sufficient answer were the parties each given consideration for the bill. Gross negligence may be evidence of *mala fides,* but is not the same thing. We have shaken off the last remnant of the contrary doctrine. Where the bill has passed to the plaintiff without any proof of bad faith in him, there is no objection to his title." Amer. & Eng. Ency. of Law, 2 edition, vol. 4, pages 299-301.

Some of the states, in the absence of a statute, follow the doctrine of the Cubit case, but the great majority of them follow substantially or in slightly modified form the rule announced in the Goodman case, as will be seen from a note to the case of Mee v. Carlson, 29 L. R. A. (N. S.) 351, in which the annotator in summing up the present state of the law upon the subject says: "But the weight of authority is that circumstances which will excite the suspicions of a prudent man are not sufficient to put the purchaser of a negotiable instrument on inquiry." To the same effect is the text, as well as the cases in the notes supporting it, in 8 Corpus Juris, pages 500-503. This court in the case of Woolfork v. Bank of America, 10 Bush 504, announced the same rule, saying: "Neither want of ordinary care nor gross negligence will divest the holder of his title, and he must be allowed to recover unless he obtained the paper *mala fides.*" See, also, 3 R. C. L., pages 1071-73.

The term *"mala fides"* as applied to conduct of the purchaser of negotiable paper before its maturity as used by the court in that opinion may be considered, as indeed it is synonymous with *bad faith* as used in the statute. We therefore conclude that the statute above referred to was but declaratory of the common law rule as theretofore existing (3 R. C. L., page 1022), and that unless

plaintiff in this case had actual knowledge of defects in the bond, or knowledge of such facts that its action in taking the bond amounted to bad faith, it is a purchaser in due course, and its right to recover can not be defeated by any defense which the defendant may have had against a prior holder.

Actual notice is defined to be either actual knowledge of the particular infirmity in the instrument or actual knowledge of facts which if investigated would disclose the infirmity or defect, and of such nature as not to investigate them would amount to bad faith, and the knowledge of facts which would impose investigation may arise from matters *aliunde* the instrument, or from facts appearing upon the face of it. There is no pretense here that plaintiff had any actual knowledge of any infirmity or defect in the bond sued on, if there existed any, and there is a total failure of proof to show that its officers at the time it purchased the bond had knowledge of any facts *aliunde* the bond which would in the least impose upon them the duty to investigate even though they were required to exercise prudence in doing so. The purchase was made from L. B. Caudill, who had the bond in his possession at the time, with all coupons maturing prior to that time detached, indicating—at least to some extent—that they had been duly discharged. Caudill's father lived in the town where plaintiff bank was located, and so far as the record shows was an honorable man, well known by the officers of the bank. His son had been deputy sheriff of Johnson county and was introduced to the bank's officers. The cashier, on being offered the bond, submitted it to the bank's president, it appearing upon its face to be regular, and nothing appearing in the actions or conduct of the seller indicating fraud or any character of wrongdoing, and plaintiff's officers being informed as to the genuineness of the bond, &c., it was finally concluded by them to purchase it, which was done, the seller endorsing his name upon the back thereof. There certainly can be found nothing in this transaction to indicate either remotely or indirectly anything smacking of actual notice so as to convert the transaction into one of bad faith on the part of the bank.

This leaves for consideration the contention made by counsel for the county that the bond and the coupons bear upon their faces sufficient evidence of alterations,

erasures and interlineations as to apprise the officers of the bank of some infirmity in the bond at the time it was purchased, and to make their action in purchasing the bond one of bad faith, and in support of this contention the bond and the attached coupons, which were filed with the petition as an exhibit, were introduced upon the trial and have been brought here for our inspection.

At the outset it may be said that the same standard measuring the good or bad faith of the purchaser applies when he acts upon evidence furnished by the face of the paper as when he is governed by facts *aliunde* the paper. In each instance, as we have seen, his conduct must be of such a nature as to make his act in taking the instrument one of bad faith. Blakey v. Johnson, 13 Bush 197, and Woolfolk v. Bank of America, *supra*.

In 8 Corpus Juris, pages 496, 1063, it is stated that when the facts are to be determined from the face of the instrument the issue presents a question of law for the determination of the court, the text on the last page referred to saying: "And where the question is whether notice is imputable from the face of the instrument itself, the question is one of law for the court." This excerpt is supported by cases from a number of courts, including some from the Supreme Court of the United States.

But whether we adopt this rule or not, the further rule prevails with this and all courts that if the evidence be such as that reasonable men would not draw different conclusions therefrom, it is the duty of the court to direct the jury accordingly. This rule has been so frequently announced by this court as not to need substantiation by a citation of cases.

Every member of this court has closely and painstakingly examined the face of the bond sued on, as well as the coupons, and we fail to discover anything therein which would be calculated to arouse the suspicions of an ordinarily prudent man in purchasing it. True it is that on the face of the bond there appear some very faint and indistinct traces of some reddish substance in a few spots here and there, but nothing to indicate how or for what purpose this condition was brought about or produced, much less that it was the result of any fraudulent act. The coupons are practically in the same condition, except that the coloring of the spots thereon is if anything slightly more apparent than it is upon the

bond itself. In either case the coloring would scarcely be noticeable unless specific attention were called to it, and not then except by a close inspection. Blakey v. Johnson, 13 Bush, 197, and Woolfolk v. Bank of America, *supra.* It is defendant's theory that these faded and almost invisible marks are the remains of a cancellation which was written upon the bond and coupons and fraudulently erased by some holder prior to plaintiff. This could be urged with more force and with the assurance of more serious consideration if there were evidence in the record that the bond had been paid or cancelled. Whether we adopt the rule that this issue as thus presented is one of law and to be determined by the court, or one of fact and to be determined by a jury, we are forced to the conclusion that the appearance of neither the bond nor the coupons furnishes sufficient evidence to submit the issue to the jury, and no other reason interfering, the court should have sustained plaintiff's motion for a directed verdict in its favor.

But at this point it is urged that an inspection of the bond and coupons shows that the numbers on them have been altered, that the signature of the county court clerk to the coupons has been retraced, and that these alleged fraudulent acts not only vitiate the paper, but were sufficiently plain to have been detected by the officers of the bank and to have required them to investigate the title of the holder from whom they purchased it. In the first place we can not agree with counsel that an inspection of the bond and coupons reveals evidence of alterations in the respects complained of, especially are they not discernible by an ordinarily casual inspection; although it might be admitted that by a close and minute inspection, upon attention first being called to the fact, some slight evidences of the matters complained of are discoverable. But we are convinced that without special attention being called to the fact, and without very close and minute inspection, the discovery would not be made, by any ordinarily prudent man. But, however this may be, a fraudulent alteration, in order to defeat the rights of a holder of commercial paper in due course, must among other essentials be a material one. 8 Corpus Juris, 728; Tierry v. Hazelwood, 1 Duv. 104; Smith v. Lochridge, 8 Bush 423; Tranter v. Hibbard, 108 Ky. 265; Lisle v. Rogers, 18 B. M. 528, and Duker v. Franz, 7 Bush 275.

The number placed upon the paper forms no part of its obligatory terms. It is only for purposes of convenience or designation, and an alteration of it, although fraudulent, would necessarily be an immaterial one; hence, we find in 2 Corpus Juris, 1206, this statement of the law upon the subject: "The change of the serial numbers on negotiable bonds or bank bills is not material, as such numbers are extrinsic to the contract, and a change in them can not affect the liability which the instrument represents." Among the cases supporting the text are the following: Wylie v. Mo. Pac. R. R. Co., 41 Fed. 263; Morgan v. United States, 113 U. S. 476; State v. Cobb, 64 Ala. 127; Commonwealth v. Emigrant Industrial Savings Bank, 98 Mass. 12, 92 Amer. Dec. 126; Elizabeth v. Force, 29 N. J. Eq. 587; Birdsall v. Russell, 29 N. Y. 220, and Tennessee Bank Note Holders v. Fundingboard, 16 Lea. 46, 57 Amer. Reports 211.

What has been said with reference to the number of the bond and coupons applies with equal force to the contention with reference to the retracing of the name of the county clerk on the coupons, conceding that such retracing sufficiently appeared upon inspection. Upon this point the clerk himself when examined as a witness acknowledged having signed the coupons at the beginning, but was unable to say that his name had been retraced. However, such retracing is not placed by the law upon a par with forgery, since the person doing the retracing is not attempting to give validity to a thing which never had any, but rather to preserve that which did have validity.

In 2 Corpus Juris, 1220, the text says: "To retrace words already written is not of itself sufficient to vary the legal effect of the instrument, as where pencil writing is retraced with ink, and constitutes no alteration." This text is supported by Reed v. Roark, 14 Tex. 329, 65 Amer. Dec. 127; Dunn v. Clements, 52 N. C. 58, and Tutwilder v. Burns, 160 Ala. 386. Besides, sec. 125 of our negotiable instruments law, which is largely declarative of the common law upon the subject, does not include the character of alterations here complained of as material ones. We therefore conclude that defendant's contention in these respects can not be upheld.

Lastly, it is insisted that if the bond sued on was discharged and canceled, or if never issued was canceled and afterwards fraudulently procured and the can-

cellation entirely erased, plaintiff is not a holder in due course and the defense of payment and non-issue ought to prevail, and some authorities are cited in support of this contention. But, in view of what has been said in a former part of this opinion, to decide that question now would be to pronounce the law upon a supposed and not an actual state of facts, since we have determined that there is no evidence of the bond ever having been paid or canceled.

The question attempted to be raised and argued by counsel is one of such seriousness and importance as that we do not feel inclined to determine it, in the absence of facts clearly and directly presenting it. For to do so now, under the condition of this record, would convert this part of the opinion from judicial utterance to dictum. We therefore refrain from a discussion of this contention.

Upon the whole case we are convinced that the plaintiff was entitled to a directed verdict in its favor, and the judgment is reversed for a new trial and for proceedings in accordance herewith.

Whole court sitting.