## Kentucky Rock Asphalt Co. v. Mazza's Adm'r.

(Decided March 17, 1936.)

GORDON, LAURENT, OGDEN & GALPHIN for appellant.

THOMAS C. MAPOTHER for appellee.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—Affirming.

The case determines who shall lose the value of stolen bonds.

In the latter part of November, 1933, five unregistered bonds, payable to bearer, issued by the appellant, Kentucky Rock Asphalt Company (to be referred to as the Company), were stolen from the administrator of the estate of J. N. Mazza, deceased, at Huntsville, Ala. The Company was promptly advised of the theft and its aid solicited to locate the bonds. To this end the numbers of the bonds, M22 to M26, inclusive, were furnished the Company on November 26, and it wrote a New York bank, trustee of the bonds, in an effort to trace them through the presentation of the coupons. There was considerable correspondence about the matter conducted by A. A. Hermes, secretary and treasurer of the Company. He advised W. H. Tarvin, its president, about the bonds having been stolen, but it does not appear that he gave him the numbers. The Company had arrangements with certain brokers in Louisville, where it had its principal office, to buy its bonds on the market for its sinking fund at 60 cents on the dollar or less. None of these brokers or any others or any banking institution was given notice of the bonds having been stolen.

On December 4 one John Doyle appeared at the office of Smart & Wagner, brokers in Louisville, with one of the stolen bonds, and left it with them for sale. A member of the firm advised Mr. Tarvin by telephone that they had one of his Company's bonds for sale and asked what he would pay for it. Upon being advised "60 plus half commission," the brokers gave their check to Doyle, delivered the bond to the appellant, which paid them on December 6. Commissions were collected by the brokers from both the seller and the purchaser. The number of this bond, M26, does not appear to have been mentioned during these negotiations. Doyle was not known to the brokers.

A week or ten days later Doyle called upon R. M. Morton, manager of the Empire Loan Company and a lawyer, who had known him several years as the owner or representative of a circus or carnival. Doyle advised Mr. Morton that he would like to sell some bonds and asked Morton to identify him at one of the Louisville banks. The next day he took Doyle to the office of Judge L. D. Greene. Judge Greene called Mr.

Hermes and told him he had a client with some of his Company's bonds, and asked if they were all right, what their market price was, and if he would take them. Morton, Greene, and his secretary testify that the numbers of the four bonds were read over to Hermes, but Hermes testified he was positive the numbers were not given him, and that Judge Greene did not ask if they were all right. He advised that he would pay "56 or 57 for the bonds." Judge Greene also called Almstedt Bros., brokers, and the price offered by them was a little more. Thereupon the bonds were delivered to Almstedt Bros., who sold them for his account for $2,400. to Stein Bros. & Boyce, other brokers, who were authorized by the Kentucky Rock Asphalt Company to buy its bonds as stated above. They remitted their check to him for the proceeds, and he in turn delivered the check to Morton, and he to Doyle. A fee of $100 was paid Greene and Morton for their services. During the negotiations, a representative of Stein Bros. & Boyce called Mr. Tarvin, president of the Company, and told him they had $4,000 of the bonds, and he confirmed the transaction. On December 20 these four bonds were delivered to the Company, and its check, plus commissions, was remitted to the brokers. It does not appear that the numbers of these four bonds were communicated to the Company by the brokers, and Mr. Tarvin testified that he never looked at the numbers when they were delivered.

A day or so after this, a letter was received from Mazza's administrator, suggesting that the Louisville Stock Exchange might be notified that the bonds had been stolen. Then it was that Hermes discovered the five bonds had been recently purchased by his Company, and he so advised the administrator.

Doyle died a year later, which was after the institution of this suit, but before trial. The record does not indicate how Doyle acquired the bonds or disclose any fact regarding his title to them.

The suit was brought by the administrator against the Company to recover $3,000, the value of the bonds. At the close of the evidence, the court peremptorily instructed the jury to return a verdict for the plaintiff, and judgment was entered accordingly.

The rule that a person can transfer to another no greater right in personal property than he has himself has no application in the case of negotiable bonds. Under the rules of the law merchant, carried forward into the Uniform Negotiable Instruments Act, an innocent purchaser for value of such bonds is protected, even though they have been stolen. As further stated in the recent work on Bonds and Bondholders by Quindry, sec. 167:

"Any relaxation in the rules would impede commercial intercourse, interrupt credit and place burdens upon commercial and banking interests, out of proportion to any benefits that might accrue to unfortunate individual bondholders. Relaxations in the rules of evidence may be justified in particular cases, but the rules governing the title acquired by purchasers of lost or stolen bonds remain the same as they have been from time immemorial. * * * Regardless of the harshness of the rule, it is uniformly applied and the owner is denied title against a bona fide purchaser from a thief."

See, also, Defenses to Commercial Paper, Joyce, sec. 588; Caruth v. Thompson, 16 B. Mon. 572, 63 Am. Dec. 559; Greenwell v. Haydon, 78 Ky. 332, 39 Am. Rep. 234.

Among the conditions on which one is to be regarded as a holder in due course of a negotiable instrument are that he took it in good faith and for value, and at the time it was negotiated to him he had no notice of any defect in the title of the person negotiating it. Section 3720b-52, Kentucky Statutes. The presumption in the first instance is that the holder is of that class, or, as stated in the statute, "Every holder is deemed prima facie to be a holder in due course." Section 3720b-59, Kentucky Statutes. That section continues:

"But when it is shown that the title of any person who has negotiated the instrument was defective, the burden is on the holder to prove that he or some person under whom he claims acquired the title as a holder in due course."

So it is that, when it is shown in a given case that bonds were stolen, the burden shifts to the holder to

show the circumstances under which he obtained the bonds, and that such circumstances constitute him a bona fide holder. Daniel on Negotiable Instruments, sec. 1732; Bonds and Bondholders, Quindry, sec. 167; Defenses to Commercial Paper, Joyce, sec. 707; Pratt v. Higginsson, 230 Mass. 256, 119 N. E. 661, 1 A. L. R. 714; Merchants' National Bank v. Detroit Trust Co., 258 Mich. 526, 242 N. W. 739, 85 A. L. R. 350. Compare Gibbs v. Metcalf, 201 Ky. 504, 256 S. W. 1109; Bedinger v. Citizens' National Bank of Covington, 212 Ky. 486, 279 S. W. 622.

Obviously, whoever stole the bonds from the owner had no title (section 3720b-55, Kentucky Statutes), and it may justly be presumed they continued in the hands of a holder of that class until the contrary was proven. Parsons v. Utica Cement Co., 82 Conn. 333, 73 A. 785, 135 Am. St. Rep. 278. Appellant conceded knowledge that these bonds had been stolen, but continues to claim that under the circumstances it was a holder without notice, since it did not know it was buying the stolen bonds.

To constitute notice of a defect in title of the person negotiating the instruments, it was not necessary that the Company should have had actual notice. It is sufficient if it had knowledge of such facts that its action in taking the bonds amounted to bad faith. Section 3720b-56, Kentucky Statutes; Citizens' Trust & Guaranty Co. v. Hays, 167 Ky. 560, 180 S. W. 811. In this regard the courts have been quite liberal with purchasers of lost or stolen bonds. It has been held in some cases that actual notice is required, and in Merchants' National Bank v. Detroit Trust Co., supra, where it was shown that notice of bonds having been stolen was mailed to a bank and, according to custom, if it had been received would have been passed to certain officers, all of whom had part in a transaction in which stolen bonds were accepted as collateral, such facts would not affect the bank's title as a holder in due course, even though the notice might have been received, the officers might have seen it and forgotten about it, or carelessly mislaid it, so that it was not in their minds at the time the bonds were accepted as collateral. See, also, Graham v. White-Phillips Co., 296 U. S. 27, 80, 56 S. Ct. 21, 80 L. Ed. —. These cases follow an established rule that, though one has received

actual notice, if by forgetfulness or negligence he does not have it in mind when he acquires the bond, he may still be a good-faith purchaser.

The appellant would invoke the rule here. Although it had shown an interest in trying to locate the bonds, actually known to have been stolen, and to save the owners from loss, yet it says it is to be regarded as having overlooked that fact and knowledge in these negotiations and purchases. We think that view too extreme. Here is the obligor of the instruments recently stolen currently and actively engaged in an effort to find the bonds for the owner by its very same officers who were conducting that correspondence purchasing them locally through brokers—not under a general, but under a special, authority—ten days or two weeks after having been given the identification numbers. Even though we accept the version of the Company's officers that neither Smart & Wagner in the one instance, or Judge Greene in the other, gave them the numbers of the bonds proposed to be sold them, we cannot escape the conclusion that all the circumstances were such as to demand specific inquiry as to their identity. In the liberal construction of the provision of the Negotiable Instruments Act (section 3720b-56, Kentucky Statutes) that knowledge of such facts that the taking of the instrument amounted to bad faith constitutes notice of an infirmity or defect of title, it has been said generally that suspicious circumstances or gross negligence at the time of acquisition will not defeat the title. Citizens' State Bank v. Johnson County, 182 Ky. 531, 207 S. W. 8. Yet gross carelessness is surely evidence of bad faith. Daniel on Negotiable Instruments, sec. 892. It is well understood that the term "bad faith" as used in the statute does not necessarily involve furtive or evil motives, but has a commercial sense of disregard of and refusal to learn the facts when available. The circumstances and conditions may be so cogent and obvious that to remain passive amounts to bad faith. Where a purchaser has actual knowledge of suspicious circumstances or facts coupled with the means of informing himself of the facts and willfully refrains from making inquiries, his intentional ignorance may amount to bad faith. Daniel on Negotiable Instruments, secs. 892 and 913.

This is not a case where a third party, for example, a banking institution, merely received notice circulated generally of bonds having been stolen, and in its regular business transactions got hold of them, perhaps through an officer or employee who had no individual knowledge or who overlooked the fact. Nor are the facts like those in the Hays Case, supra, where one had embezzled bonds and pledged them to secure a loan secured through the assistance of a broker, who himself later acquired an equity in them. All parties in that case were shown to have been innocent of any defect in title and of any circumstances which might have constituted notice. They were clearly bona fide purchasers for value and holders in due course.

It seems to us, therefore, the circumstances did not relieve the company of the responsibility of showing that Doyle's title was not defective. This it did not undertake to do.

The appellant, however, is maintaining that the brokers from whom it acquired the bonds were bona fide holders. It accordingly invokes the provision of section 3720b-16, Kentucky Statutes, that:

"Where the instrument is in the hands of a holder in due course, a valid delivery thereof by all parties prior to him so as to make them liable to him is conclusively presumed."

It relies also upon section 3720b-58, Kentucky Statutes, as follows:

"In the hands of any holder other than a holder in due course, a negotiable instrument is subject to the same defenses as if it were non-negotiable. But a holder who derives his title through a holder in due course, and who is not himself a party to any fraud or illegality affecting the instrument, has all the rights of such former holder in respect of all parties prior to the latter."

See Citizens' Trust & Guaranty Co. v. Hays, supra.

We cannot concur in the application. We think all the parties intermediate of Doyle and the Company are to be regarded as agents or brokers, and that delivery to them respectively was "conditional or for a special purpose only, and not for the purpose of transferring the property in the instrument." Section

3720b-16, Kentucky Statutes. They were but conduits between Doyle and the Company, and were not liable to the true owner. Gruntal v. United States Fidelity & Guaranty Co., 254 N. Y. 468, 173 N. E. 682, 73 A. L. R. 1337.

By analogy the case in this connection is not unlike Harter v. People's Bank of Buffalo, 221 App. Div. 122, 223 N. Y. S. 118, 123. The manager of a branch bank purchased stolen bonds under such circumstances that the jury reasonably and justifiably found it was not in good faith. The bank sold the bonds through brokers to various parties who took them in good faith and for value. After it was discovered that the bonds had been stolen, they subsequently came back to the bank in the usual course of business. On the appeal of the case, the bank urged that, when it was obliged to pay back the money it had received from the brokers, it acquired good title on such purchase. Said the court:

> "Our opinion is to the contrary. If defendant took the bonds from McGirr in the first instance in bad faith, as found by the jury, when they were subsequently sold to various bona fide holders, and, on the theft being discovered, defendant was obliged to redeem them, it cannot 'shelter itself' behind the rights of bona fide holders from whom it may have subsequently purchased them. 8 Corpus Juris, 466-468; Section 97, Negotiable Instruments Law; Devlin v. Brady, 36 N. Y. 531; Woods v. Sizer, 102 Misc. 453, 169 N. Y. S. 86; Olmstead v. Winsted Bank, 32 Conn. 278, 85 Am. Dec. 260; Hatch v. Johnson Loan & Trust Co. (C. C.) 79 F. 828; Dollarhide v. Hopkins, 72 Ill. App. 509."

See, also, Gruntal v. United States Fidelity & Guaranty Co., supra, construing section 97, Negotiable Instruments Act, N. Y., Consol. Laws, c. 38 (section 3720b-58, Kentucky Statutes), in which it is declared that one having knowledge of defect of title in bonds stolen at the time of transfer does not change his position upon reacquisition of the bonds from a holder in due course.

While it is generally said that the good or bad faith of the purchaser of a negotiable instrument is a

question for the jury, that of course is conditioned upon there being a conflict in evidence, and can have no application where the facts are as here, undisputed on the controlling points. It was therefore the duty of the court to apply the law to the facts, which he did.

The judgment is affirmed.